UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE AND TELE-
GRAPH COMPANY; Western Electric
Company, Inc.; and Bell Telephone Lab-
oratories, Inc., Defendants.

Civ. A. No. 74–1698.

United States District Court,
District of Columbia.

Sept. 11, 1981.

Gerald A. Connell, U. S. Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff.

Jim G. Kilpatric, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, George L. Saunders, Jr., Sidley & Austin, Washington, D. C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

Defendants have moved to dismiss this action pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, asserting that the government, having concluded its case-in-chief, has failed to demonstrate a right to relief. The complaint charges violations of section 2 of the Sherman Act, 15 U.S.C. § 2, by the American Telephone and Telegraph Company (AT&T) and two of its subsidiaries, the Western Electric Company (Western), and the Bell Telephone Laboratories, Inc. (Bell Labs), the basic allegation being that the defendants (Bell System)[1] have monopolized the telecommunications market in the United States.[2]

Following a period of intensive pretrial activity,[3] trial was begun on January 15, 1981, and the first witness was called on March 4, 1981.[4] The presentation of evidence on behalf of the government spanned a period of four months,[5] and it included the examination of close to one hundred witnesses and the introduction of thousands of documents and additional thousands of stipulations. In keeping with the massive nature of the action, defendants have filed a memorandum of over 550 pages in support of their motion, and the government's brief in opposition is almost equally lengthy. Thus, there is a voluminous record before the Court. Although not every detail of the evidence is discussed in this opinion, it does consider fully all the principal issues (whether or not they are being finally decided) in order to provide to the parties the Court's views on the structure of this factually and legally complex case. Before examining the specific issues raised by the record, the Court must resolve several preliminary questions.

## I

### General

A. The first question to be determined concerns the standard to be applied in determining whether the government's case is adequate to withstand the motion.

Rule 41(b) provides in part that

After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may

---

1. Defendants will also sometimes be referred to as AT&T or Bell.

2. The complaint alleges an unlawful combination among the defendants and certain co-conspirators (principally the Bell Operating Companies, which operate Bell's local facilities) designed to permit AT&T to retain control over Western, Bell Labs, and the Operating Companies; to restrict competition from other telecommunications systems and from other manufacturers and suppliers of telecommunications equipment; and to cause Western to supply substantially all of the Bell System's telecommunications requirements.

3. See *United States v. Am. Tel. & Tel. Co.*, 498 F.Supp. 353 (D.D.C.1980); 461 F.Supp. 1314 (D.D.C.1978); 88 F.R.D. 47 (D.D.C.1980); 86 F.R.D. 603 (D.D.C.1979); 84 F.R.D. 350 (D.D.C. 1979); 83 F.R.D. 323 (D.D.C.1979).

4. The trial was recessed for six weeks after the opening statements were made in January to permit the holding of settlement talks, but these ultimately proved futile.

5. Although the present motion was heard and is being decided after defendants began the presentation of their own evidence, the Court is here considering only the proof adduced during the government's case in chief.

decline to render any judgment until the close of all evidence.[6]

This Rule, and judicial interpretations thereof, grant to the courts considerable discretion in their treatment of motions to dismiss in non-jury cases. A court faced with a Rule 41(b) motion—unlike one passing on a motion for a directed verdict in a jury case—is not required to view the record in the light most favorable to the plaintiff, or to deny the motion if a prima facie case has been made out; rather, it is empowered to weigh and evaluate the evidence the plaintiff has presented and to grant the motion if it is convinced that, on the merits, the evidence preponderates against the plaintiff. *Ellis v. Carter*, 328 F.2d 573, 577 (9th Cir. 1964); *Island Service Co. v. Perez*, 309 F.2d 799, 803 (9th Cir. 1962); *Huber v. American President Lines*, 240 F.2d 778 (2d Cir. 1957).

█ Yet a court is not required to grant a defendant's motion at this stage of the proceedings even if under the law that motion might have been granted. *SEC v. Murphy*, 626 F.2d 633, 659 (9th Cir. 1980). Rule 41(b) and the case law permit a trial judge to decline to render any judgment at all until the close of all the evidence. *Weissinger v. United States*, 423 F.2d 795, 797 (5th Cir. 1970). The decision on the motion to dismiss is a "tentative and inconclusive ruling on the quantum of plaintiff's proof," which does not preclude a court from making findings and conclusions at the close of the case that are inconsistent with its prior tentative ruling. *Armour Research Foundation v. Chicago, Rock Island & Pacific Railroad Co.*, 311 F.2d 493, 494 (7th Cir. 1963).

Several of the courts of appeal have admonished trial judges to grant Rule 41(b)

dismissals sparingly. "Except in unusually clear cases the district judge can and should carry defendant's Rule 41(b) motion with the case—or simply deny it, since the effect will be the same—let the defendant put on his evidence, and then enter a final judgment at the close of the evidence." *Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 793 n. 19 (5th Cir. 1975); *cf. Poller v. Columbia Broadcasting System Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). The reason for caution in such instances is that "an appellate reversal for error in granting the motion may require an entire new trial." *SEC v. Murphy, supra*, 626 F.2d at 659; see *White v. Rimrock Tidelands, Inc.*, 414 F.2d 1336 (5th Cir. 1969). This concern is particularly pertinent to the present action, in light of the lengthy course of the pretrial and trial proceedings up to this point, and the desire of no doubt all those involved to avoid the expenditure of time and resources that would result from the necessity of a second trial. In its weighing of the government's evidence, the Court has kept these general principles in mind.

B. Another preliminary question involves the manner in which the evidence presented by the government should be divided for the purpose of considering its sufficiency in light of the motion. Defendants have suggested that, should the Court decline to dismiss the case in its entirety, it should adopt an episode-by-episode approach—that is, that it should examine the sixty-odd episodes[7] one-by-one, and separately determine the sufficiency of the evidence adduced with respect to each under the antitrust laws. The government, on the other hand, supports a "course of conduct" approach. It argues that the Bell System

**6.** The Rule goes on to require that the Court make findings as provided in Rule 52(a) if it renders judgment on the merits against the plaintiff, and to state that a dismissal operates as an adjudication upon the merits unless otherwise specified by the Court.

**7.** Each "episode" contains both stipulations and proof (in addition to the parties' contentions) with regard to factual transactions involving particular Bell competitors or particu-

lar competing telecommunications equipment. See *United States v. Am. Tel. & Tel. Co., supra*, 88 F.R.D. at 49, for a more detailed description of the episode process. The division of the case into these particular segments was performed by defendants in their Third Statement of Contentions and Proof, filed March 10, 1980, and it was adopted by the government in its subsequent submissions of evidence.

has engaged in a pattern of anticompetitive conduct since the end of World War II, that this overall pattern of conduct requires an interrelated examination of all the proof adduced thus far, and that the Court should therefore determine the sufficiency of the evidence in an aggregate, rather than a piecemeal fashion.

■ The episode-by-episode approach must be rejected.[8] From a purely technical point of view, there is but a single claim of violation of the Sherman Act before the Court, and procedurally that claim may not be segmented for dismissal purposes.

■ Substantively, too, defendants' approach is inappropriate. It is true that the government's evidence may be weaker with respect to certain episodes than to others; for example, defendants have raised serious questions as to whether the misfortunes befalling certain of Bell's competitors were caused by the Bell System or by defective products or mismanagement within the competing companies. See, e. g., p. 1351, infra. However, the theory of the government's case is, basically, that the defendants engaged in a general, overall practice of anticompetitive behavior and that, in implementation of that practice, they resisted competition from weak and strong companies alike. Upon that basis, the government's claim is not defeated by the circumstance that some of Bell's competitors may have fallen prey to their own internal difficulties rather than to Bell System activities; even if actual injury to a competitor was not caused by the conduct of defendants, proof of that conduct may still be relevant

as evidence of their intent to discourage all competitors, large and small. See Hecht v. Pro-Football Inc., 570 F.2d 982, 990 (D.C. Cir.1977). In any event, fragmentation of the government's proof on the basis of "episodes" designed essentially only for pretrial procedural purposes (see note 7, supra) has no basis either in precedent or in logic.

■ It is clear, moreover, that otherwise innocent or ambiguous behavior may violate the Sherman Act when considered together with the remainder of the conduct. See Poller v. Columbia Broadcasting System, Inc., supra, 368 U.S. at 468–69, 82 S.Ct. at 488–89; Maryland and Virginia Milk Producers Association, Inc. v. United States, 362 U.S. 458, 471–72, 80 S.Ct. 847, 855–56, 4 L.Ed.2d 880 (1960); Schine Chain Theatres v. United States, supra, 334 U.S. at 119, 68 S.Ct. at 952; American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946). Such behavior may thus be relied upon to sustain other evidence so as to form a pattern of conduct made unlawful by that statute.[9]

The decisions cited in defendants' pretrial brief in support of an episode-by-episode or a "discrete conduct" approach to the evidence involved private antitrust actions, where courts quite appropriately held that evidence of anticompetitive conduct involving injury to non-parties could not help a private plaintiff who was not able to show anticompetitive injury to himself. See, e. g., California Computer Products Inc. v. IBM, 613 F.2d 727, 743 (9th Cir. 1979). But this action is not a private suit, and the

---

8. In Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) the Supreme Court found such an approach to be improper. The Court of Appeals had ruled separately with regard to the five episodes which comprised the case, each of them containing evidence concerning damage to plaintiff by one of the defendants. Justice White, speaking for the Court, found it apparent

that the Court of Appeals approached Continental's claims as if they were five completely separate and unrelated lawsuits. We think this was improper. In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmental-

izing the various factual components and wiping the slate clean after scrutiny of each. 370 U.S. at 698–99.

See also Schine Chain Theatres v. United States, 334 U.S. 110, 119, 68 S.Ct. 947, 952, 92 L.Ed. 1245 (1948).

9. In Northeastern Tel. Co. v. American Tel. & Tel. Co., 651 F.2d 76, p. 95 n. 28 1981–1 Trade Cas. ¶ 64,027, p. 76,307, 76,332 n. 28 (2nd Cir. 1981), the court did not reject a course of conduct approach; rather, it held that where "proof [is] utterly lacking, … treating … claims collectively cannot have any synergistic effect."

government's case does not hinge upon proof of injury to every Bell competitor about whom evidence has been adduced.

Notwithstanding all of these considerations, it is apparent that, in a case of this scope and size, it would be impossible to examine the evidence without somehow dividing it into separate parts, even if only for the purposes of analysis. The evidence introduced during the trial appears to divide naturally into supporting three major kinds of claims (within the overall Sherman Act claim): [10] (1) claims relating to customer-provided terminal equipment [11] (discussed in Part III of this opinion); (2) claims relating to intercity communications services [12] (discussed in Parts IV, V, VI, VII and VIII of this opinion); and (3) claims relating to the procurement by the Bell System of telecommunications equipment manufactured by "general trade suppliers," i. e., non-Bell companies (discussed in Parts IX, X and XI of this opinion).[13] The validity of each of these major claims, in turn, depends upon the resolution of a number of factual and legal issues and, within the parameters of these claims, this opinion will consider these various issues under separate headings. This division and subdivision into issues should not obscure the fact, however, that the Court will be considering the evidence in the context of a single Sherman Act claim on a course-of-conduct basis.

 C. In addition to various fact-based issues, defendants raise certain legal defenses which, in their view, compel dismissal of all or part of the action at this time. These defenses are discussed hereinafter together with the major subjects to which they primarily relate. However, one of these defenses—that the present controversy is properly within the exclusive jurisdiction of the Federal Communications Commission (FCC) and that defendants' activities are therefore impliedly immune from the antitrust laws—potentially governs all or almost all of the case. This claim has previously been addressed and rejected by the Court. See *United States v. Am. Tel. & Tel. Co., supra,* 461 F.Supp. at 1320–30. The intent of Congress to repeal the antitrust laws through a regulatory scheme must be clear if a court is to find an immunity from these laws,[14] and the question whether such an intent should be imputed to the Congress is no more certain now, in light of the government's evidence, than it was at the time of the Court's previous ruling. Accordingly, that ruling will not be disturbed at this time.

## II

### Monopoly Power and Regulation

Under *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966), the offense of monopolization under section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power. Part of the government's burden herein is to define one or more relevant markets and to prove that defendants possess monopoly power in these

---

**10.** Claims relating to relief are not before the Court at this time, and no judgment will be made herein as to the strength or weakness of the government's relief proposals. For the purposes of this motion to dismiss, the Court is concerned only with liability.

**11.** Telephone sets, PBXs, key systems, repertory dialers, answering devices, data modems, and the like.

**12.** Intercity telecommunications services are, broadly speaking, what is generally referred to as long distance telephone service. See note 18, *infra.*

**13.** Part II discusses general issues relating to monopoly power.

**14.** In addition to precedent previously cited, see the recent *National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City,* —— U.S. ——, 101 S.Ct. 2415, 2420–21, 69 L.Ed.2d 89 (1981); *Sound, Inc. v. Am. Tel. & Tel. Co.,* 631 F.2d 1324, 1327–31 (8th Cir. 1980); *Mid-Texas Communications Systems, Inc. v. Am. Tel. & Tel. Co.,* 615 F.2d 1372, 1377–82 (5th Cir. 1980); *Essential Communications Systems, Inc. v. Am. Tel. & Tel. Co.,* 610 F.2d 1114 (3rd Cir. 1979).

markets [15]—that is,'that they have the power to control price or to exclude competition therein. *United States v. Grinnell Corp., supra*, 384 U.S. at 570, 86 S.Ct. at 1703. The term "relevant market" refers to the "area of effective competition" in which the defendants operate. *Standard Oil Co. of California v. United States*, 337 U.S. 293, 299–300 n. 5, 69 S.Ct. 1051, 1055, 93 L.Ed. 1371 (1949).[16]

The government has identified three relevant markets: local telecommunications service,[17] intercity telecommunications service,[18] and telecommunications equipment.[19] In addition, it has subdivided the equipment market, identifying two submarkets:[20] (1) a terminal equipment market, and (2) a "Bell Market," that is, a market consisting of the equipment purchased by the Bell Operating Companies and Long Lines.[21] The government alleges that defendants have monopoly power in each of these markets and, to prove the existence of such power, evidence has been offered of market share, barriers to entry, size, and the exercise of power.

There are two major issues between the parties with respect to the government's market definition: (1) whether the government properly considered the impact of regulation, and (2) whether it properly defined and quantified the equipment market and the submarkets.[22] In this part of the opinion, the Court will discuss only the first of these issues. The second issue, because it relates most directly to the procurement aspect[23] of this case, is discussed in Part X below, in conjunction with the section dealing with procurement conduct.

■ Defendants argue primarily[24] that the government's reliance upon high market shares is fundamentally unsound in the context of a regulated industry because such reliance ignores the substantial periods of time during which the Federal Communications Commission restricted entry, there-

---

**15.** See, *e. g., United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 381, 76 S.Ct. 994, 999, 100 L.Ed. 1264 (1956).

**16.** The "area of effective competition" has two dimensions, the product market and the geographic market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). At least for purposes of the present motion, the focus of the parties' dispute has been on the product aspect of the market.

**17.** Local communications services are the ordinary telecommunications services used in most homes and businesses for which generally no long distance rates are charged.

**18.** The intercity telecommunications market includes private line services, message toll service, wide area telephone service, telegraph service, and TWX/Telex service.

**19.** The products within the telecommunications market as defined by the government consist of "the electronic and electromechanical equipment designed and marketed for use in the facilities network used to provide telecommunications service, including the variety of devices and circuitry that combine to originate, transmit, switch and terminate messages in that network" (episode 8, stipulation paragraph 122).

**20.** A product market may contain relevant submarkets. See, *e. g., Brown Shoe Co. v. United States, supra; Reynolds Metals Co. v. FTC*, 309 F.2d 223, 227 (D.C.Cir.1962).

**21.** Long Lines is the department of AT&T that provides intercity telecommunications services.

**22.** There is no contest concerning the formulation of the local services market and little dispute on that of the intercity services market.

**23.** That issue does not relate exclusively to procurement, however, and the market problems discussed in Part X also touch upon the terminal equipment interconnection claims.

**24.** They also contend that the existence of maximum rate-of-return regulation at both the federal and state levels precludes as a matter of law a finding that they possess monopoly power, but this point is clearly without merit. The government offered abundant evidence to support its contentions that the regulatory process does not succeed, in fact, in ensuring that defendants will not transfer excess profits to Western Electric (by including excessively priced equipment purchased by the Operating Companies in their rate base), or in preventing defendants from cross-subsidizing underpriced services with revenues from overpriced areas. It remains to be seen whether this evidence will ultimately be refuted; but the Court will not assume refutation as a matter of law. See 3 Areeda & Turner, *Antitrust Law*, ¶ 726e, pp. 217–20 (1978).

by effectively granting monopolies to the Bell System. See *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 631–32 n. 34, 94 S.Ct. 2856, 2874–75, 41 L.Ed.2d 978 (1974).[25] In this view, the government's demonstrations of market share "are almost totally irrelevant" because the "alleged markets [are treated] not as products of regulation, but as though they had come into being through a long history of open competition" (Memorandum, p. 26).[26] Although defendants' point may have some conceptual validity,[27] it is not grounds for dismissal, for two reasons.

First, a broad legal dispute exists between the parties concerning the relationship between the Communications Act (and FCC orders issued pursuant thereto) and the Sherman Act. Defendants argue that none of the markets for terminal equipment, point-to-point private line intercity service, FX and CCSA service, and MTS-type service (see *infra*) could become an "area of effective competition" within the meaning of the antitrust laws until the FCC had mandated interconnection to vendors in these areas. That argument, however, is but a variation of defendants' broader claim that compliance with the communications laws satisfies all obligations under the anti-

trust laws, and as such it is vigorously contested by the government which contends that the antitrust laws impose obligations beyond whatever requirements are set by the FCC under the Communications Act. As indicated below in Part V, and for the reasons there stated, a decision on that issue is premature. In the absence of a determination that the regulatory scheme confers antitrust immunity, the practical effect of regulation will therefore be considered by the Court "simply as another fact of market life." *International Tel. & Tel. Co. v. General Tel. & Elec. Corp.*, 518 F.2d 913, 935–36 (9th Cir. 1975).

Second, even if defendants are ultimately sustained on this issue, the government's market contentions would still not fail, for these contentions do not rely exclusively, or even primarily, upon market shares to prove monopoly power. While such shares clearly constitute one part of the proof, evidence has also been offered on barriers to entry,[28] size,[29] and conduct,[30] all of which tend to prove such power. Although the size and conduct factors do not appear to be highly probative,[31] a persuasive showing has been made that defendants have monopoly power (wholly apart from FCC orders with

25. As defendants see it, the relevant markets may be defined only by reference to the regulatory framework and that, by failing to do so, the government's calculations inaccurately measure their market power.

26. The situation is analogized to an examination of market share of the holder of a patent one day after the patent has expired.

27. Even conceptually, however, the argument suffers from the defect that it must necessarily ignore the fact that Western Union provided intercity services well before the FCC opened the market to wider entry. This, of course, weakens any claim of a competitive market vacuum prior to the relevant regulatory decisions.

28. See *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377–79, 93 S.Ct. 1022, 1029–30, 35 L.Ed.2d 359 (1973); *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 572, 87 S.Ct. 1224, 1227, 18 L.Ed.2d 303 (1967); *FTC v. Borden Co.*, 383 U.S. 637, 639–40, 86 S.Ct. 1092, 1094–95, 16 L.Ed.2d 153 (1966); *United States v. Terminal R.R. Ass'n of St. Louis*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *Smith Kline Corp. v.*

*Eli Lilly & Co.*, 427 F.Supp. 1089, 1124–25 (E.D. Pa.1976), *aff'd*, 575 F.2d 1056 (3rd Cir. 1978).

29. See *United States v. Griffith*, 334 U.S. 100, 107 n. 10, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 174, 68 S.Ct. 915, 937, 92 L.Ed. 1260 (1948).

30. See *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1219 (9th Cir. 1977); *Power Replacement Corp. v. Air Preheater Co., Inc.*, 356 F.Supp. 872, 896–97 (E.D.Pa.1973).

31. Size is typically described as an "earmark of monopoly power," *United States v. Griffith, supra*, 334 U.S. at 107 n. 10, 68 S.Ct. at 941, and although this may be true, size does not alone establish market power. It is, on the one hand, redundant with market share data, and, on the other, in the absence of significant barriers to entry, it is undeterminative on the existence of market power. With regard to the problems occasioned by inferring power from conduct, see 2 Areeda & Turner, *supra*, ¶ 515, at pp. 344–45.

respect to interconnection) through various barriers to entry,[32] such as the creation of bottlenecks,[33] entrenched customer preferences, the regulatory process, large capital requirements, access to technical information, and disparities in risk.[34] These factors, in combination with the evidence of market shares, suffice at least to meet the government's initial burden, and the burden is then appropriately placed upon defendants to rebut the existence and significance of barriers to entry.[35] On that basis, the defendants' regulatory defense to the government's claim of monopoly power must and will be rejected.

The Court will next consider evidence concerning, and the various issues surrounding, the claim that defendants engaged in anticompetitive conduct.[36]

## III

### Interconnection of Customer-Provided Terminal Equipment

■ A. Until 1968, the connection to the public network of any piece of equipment not provided by an operating telephone company was prohibited by what was called the "foreign attachment provision" of Tariff No. 263.[37] A principal rationale for this ban was that the interconnection of equipment of undetermined origin and quality might injure the network as a whole. The FCC struck down this tariff in its *Carterfone* decision (13 F.C.C.2d 420 (1968)),[38] which determined the practice of prohibiting equipment interconnection "without regard to its effect upon the telephone system" to be unlawful and unreasonably discriminatory. 13 F.C.C.2d at 425. The FCC held that customers had a right to the unimpeded use of their own equipment, and that the Bell System could more appropriately protect the telephone network from harm (1) by preventing of the use of devices "which actually cause harm," and (2) by establishing "reasonable standards to be met by interconnection devices." 13 F.C.C.2d at 424. Defendants' response to this decision forms the principal basis of the government's claim in this area.

That response was the filing of the "post-*Carterfone*" tariffs. The pertinent provisions of these tariffs required that any piece of equipment provided by a customer[39] for use in conjunction with Bell facili-

---

**32.** At present, at least, the FCC is not authorizing interconnection restrictions, and thus Communications Act regulation could not be an antitrust defense in relation to such barriers.

**33.** Since 1960, the Bell Operating Companies have provided local exchange service for over 80 percent of all telephones in the United States, and they have collected 85 percent of all local service revenues. Most of the largest metropolitan areas are served at least in part by one of the Operating Companies.

**34.** See generally *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945); *United States v. E. I. du Pont de Nemours & Co., supra*, 351 U.S. at 401–04, 86 S.Ct. at 1704; *United States v. Grinnell, supra*, 384 U.S. at 571, 86 S.Ct. at 1704; *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 340–44 (D.Mass.1953).

**35.** Defendants may discharge that obligation, if they should so choose, by proving, for example, that the government's market share data are obsolete or inaccurate and that more recent and more precise calculations show defendants' shares of the relevant markets to have dropped significantly to low levels and that forecasts predict that they will continue to fall. Such proof would contradict the existence of significant barriers to entry, for a reduction in Bell's share would imply that barriers no longer furnish monopoly power. In any event, defendants must offer such evidence as part of their own case, and neither one government witness's reference to "explosive competition" nor one competitor's comment that he has as much business as he can handle suffices to overcome the government's substantial overall evidence to the contrary.

**36.** Some of the "conduct" evidence also relates to the element of willfulness, *i. e.*, intent.

**37.** This tariff stated in part that
No equipment, apparatus, circuit or device not furnished by the telephone company shall be attached to or connected with the facilities furnished by the telephone company, whether physically, by induction or otherwise.

**38.** *Carterfone* was foreshadowed in some respects by *Hush-a-Phone Corp. v. United States*, 238 F.2d 266 (D.C.Cir.1956).

**39.** That is, a residential user of telephone service who might wish to purchase his own telephone apparatus from a non-Bell source, or a

ties could be connected with the public switched network only through a protective connecting arrangement (PCA) provided (and leased to the customer for a fee) by the Bell System. The questions here are whether this requirement and its implementation were intended unreasonably and anticompetitively to ensure that Western Electric would remain the dominant supplier of telecommunications equipment in the United States, and whether, in fact, they had that effect.

B. The government's proof may be summarized as follows. Evidence submitted under the aegis of ten of the eleven "equipment episodes" describes the experience with the PCA requirement of a number of individual companies which were engaged in the business of marketing terminal equipment directly to end users.[40] The testimony and exhibits presented in support of the government's contentions in these episodes tended to show that the PCA requirement was unnecessary;[41] that the PCAs imposed by Bell were overly engineered and that their cost, when added to that of the terminal equipment itself, either foreclosed non-Bell manufacturers from the particular equipment market or made it difficult for them to compete with Western Electric;[42]

that PCAs were often unavailable, that their delivery was sometimes substantially delayed, or that they were incompatible with non-Bell equipment;[43] and that the stated need for the PCA and the defects of some PCAs caused customers to fear that, unlike Western Electric products, non-Bell equipment was unsafe and unreliable.[44]

The eleventh episode is the "umbrella" package,[45] concerning more generally Bell practices and policies with regard to the interconnection of customer-provided terminal equipment. The evidence presented in conjunction with this episode tended to show the following.

As of 1968, the time of the *Carterfone* decision, defendants had considered at least two options to protect the network from harm by customer-provided equipment: the PCA requirement and a certification program. A certification program—that is, a means by which non-Bell equipment would be permitted to be connected to the network after it had been certified to meet certain technical standards—would have obviated the need for the PCAs, with their costs, problems, and drawbacks, and it would thus have been consistent with the FCC's *Carterfone* mandate to liberalize in-

business customer who desired to attach and use more sophisticated non-Bell equipment, such as switchboards or repertory dialers.

40. These episodes are: 44 (PBXs and Key Systems distributed by Pritec); 45 (Phonemate answering devices distributed by Phonemate); 46 (Code-a-phone answering machines manufactured and/or distributed by Ford Industries); 47 (Bell Chimes manufactured by Northern Electric); 50 (PBXs by Litton); 52 (PBXs by General Electric); 54 (Phonemaster by Phonetele); 55A (Data modems by Racal-Milgo); 56 (Telepatcher conferencing device manufactured by Telephonic Equipment Corp.); 60 (Magicall repertory dialer manufactured by DASA).

41. There was evidence that such equipment never caused any actual harm to the network (see episodes 50, 52, 54, 56, 60), that from an engineering standpoint, the PCAs were not necessary to protect the network from harm (see episodes 44, 54, 55A), and that pieces of identical equipment, when purchased by Western Electric from the general trade and installed by Bell Operating Companies, were not subject to

the PCA requirement (see episodes 46, 50, 55A, and 60). (References herein to episodes as supporting various statements are meant to include both the actual stipulations contained in the stipulation packages and the evidence adduced by the government in support of the contentions listed in these packages).

42. With regard to engineering, see episodes 44, 45, 54, and 56; with regard to cost, see episodes 50, 52, 54, and 55A.

43. When PCAs were unavailable, the particular non-Bell equipment could not be installed at all consistently with the Bell tariffs (episodes 44, 45, 54, and 56); when they were delayed, equipment manufacturers were unable to meet their installation schedules (see episodes 44, 45, 50, 52, and 54); when they were incompatible, the non-Bell manufacturer had to redesign his own equipment (see episodes 52, 54 and 55A).

44. See episodes 44, 50, 52.

45. Episode 42.

terconnection policy.[46] Nevertheless, defendants decided to implement a PCA tariff[47] rather than the certification option.[48]

The government's evidence further tended to show that, during the five-year period after 1968, defendants concluded that the implementation of some kind of certification program was feasible,[49] but they nevertheless decided to oppose any liberalization of their interconnection policy (whether by certification or otherwise) out of concern over the effect on their revenues and market position.[50] Defendants were at that time also aware of (and they encouraged) the barrier to competition created by the unavailability and inadequate maintenance of the PCAs as well as of the additional economic barrier these devices created because of their added cost.[51] The government's proof further indicated that defendants were unable ever to find empirical support for the proposition that the PCA

policy was necessary to prevent actual harm to the telecommunications network.[52]

Finally, the evidence showed that, at approximately the same time that the FCC initiated its own certification docket on June 14, 1972,[53] Bell decided to continue to withhold support from any effort to establish a certification program in order to "buy time" for internal restructuring so as to enable it to prosper in a competitive market.[54]

C. In the course of the trial, defendants made serious attempts to shake the credibility of each of the government's witnesses through cross examination and to cause them to concede that the facts they had related and the conclusions they had drawn from these facts were inaccurate and unwarranted. Some of the witnesses did, to a greater or lesser degree, make concessions which detracted from the force of their direct testimony.[55] However, by and large,

**46.** Defendants have suggested, by way of cross-examination, that the certification option would have had its own drawbacks (especially delay), but concrete and sufficient proof, particularly regarding the magnitude of these drawbacks, has yet to be adduced.

**47.** Defendants have argued that they were obligated by law to enforce their filed and effective tariffs, but these tariffs were their own creation, and they could have cancelled them at any time. See 47 C.F.R. § 61.57.

**48.** Plaintiff's Exhibits 1075, 1076, 1090, 1105, 2055, and 2064.

**49.** According to the government's evidence, the technical standards upon which a certification program could have been based were available as early as 1968, and defendants' own engineers had developed proposals to implement such a program by 1971. See testimony of Vladislav Bevc, and Plaintiff's Exhibits 1073 and 1084.

**50.** Plaintiff's Exhibits 1069, 1073, 1077, 1082, 1084, 1096, 1971, and 2008.

**51.** Plaintiff's Exhibits 761, 1638, 1957, 1959, 1961, 1975, 1977, 1979, 1983, 1987, 1988, and 2008.

**52.** Plaintiff's Exhibits 1069, 1086, 1097, and 1104. The evidence also indicated that the PCAs were not designed to protect against all of the recognized harms to the network, that they were overly restrictive, that the functions they performed were often redundant, and that

they served to degrade rather than to enhance telephone service. See testimony of Vladislav Bevc, and Plaintiff's Exhibits 1477, 1973, and 1969.

**53.** Docket No. 19528.

**54.** Plaintiff's Exhibits 1103, 1106, 2024, 2034, 2037, 2039, 2040, 2082, 2093, and 2097. Much of the evidence in this regard relates to AT&T's internal planning. However, the government also sought to prove that when the FCC finally did adopt a registration program in 1975 (see 56 F.C.C.2d 593) defendants, after having consistently opposed this concept on the ground that the network would be insufficiently protected, filed extensive recommendations for the relaxation of the technical standards which they themselves had originally proposed to the FCC. This change in policy was allegedly stimulated by the circumstance that the standards would be imposed upon Bell as well as non-Bell equipment. See stipulation paragraphs 736–745 in episode 42; Plaintiff's Exhibits 1287, 2086, 2088, 2089. However, since this proof directly concerns the positions taken by defendants before the FCC, the Court may not rely upon it as a basis for antitrust liability. See Part VII, infra.

**55.** For example, the credibility of both John Van Doorne (episode 54) and Vladislav Bevc (episode 42) as expert witnesses was undermined to some extent by defendants' questioning, and the cross-examination of Neil Buglewicz (episode 45) and Robert Feiner (episode 54)

the evidence adduced sustained the government's charges.

The Court will not comment upon the credibility of every single witness at this stage of the proceedings. Suffice it to say that when it is stated herein that the evidence demonstrated or tended to show the existence of certain facts, the Court has determined that the witnesses and documents have credibly established these facts to be true. Defendants will, of course, have the opportunity, as part of their own case, to introduce evidence both to contradict the government's proof and to show affirmatively that the facts are not what the government's witnesses described them to be. But, as indicated, on a factual basis the government's terminal equipment interconnection case presently stands unimpeached.

D. The other defenses to that case must also be rejected, generally for similar reasons.

■ First, defendants contend that the reasonableness of their actions should be judged in light of the Bell System's affirmative legal responsibility to protect the telephone network from harm (13 F.C.C.2d at 424), and the fact that the government's own witnesses conceded that at least a potential for harm to the network exists from the interconnection of substandard telephone equipment.[56] But these contentions must be examined in light of the overriding consideration that, by controlling who could obtain PCAs, when, and at what cost, Bell was in a position to control the entry of potential competitors into the market— much as if it controlled the only source of a raw material essential to the manufacture of a particular product,[57] or an essential facility such as a bridge[58] or a stadium[59] which competitors needed to use to conduct their business. See 2 Areeda & Turner, *supra,* ¶ 409f, pp. 305–06. Although the record at this point contains many suggestions that the interconnection of inferior equipment *may* cause harm[60] to the network,[61] it does not show that the actual, or even the potential, harms associated with such interconnection were sufficiently substantial[62] to render a practice so fraught with anticompetitive implications as the PCA tariffs reasonable under the antitrust laws. See *Northeastern Tel. Co. v. American Tel. & Tel. Co., supra,* 651 F.2d 76, 1981–1 Trade Cas. at 76,322. Any showing in that regard must therefore await defendants' own evidence.

■ Second, defendants claim (1) that they believed that the PCA requirement conformed to the approach prescribed by the FCC in *Carterfone* and was therefore reasonable, and (2) that the difficulties experienced by some competitors in entering the terminal equipment market were due not to the PCA requirement but to their own bad business judgment, their shoddy merchandise, and the like. While there is

---

raised doubts as to the quality of the products they sold. On the other hand, the testimony in support of some of the episodes was quite convincing: see episodes 44 (Ronny Harlow); 46 (James Owen); 50 (Lowell Hoxie); 52 (Pier Abetti); 60 (Robin Moseley).

56. See, *e. g.*, testimony of Ronny Harlow; testimony of Francis Collins. These witnesses also conceded that reasonable means may be employed to ensure that such interconnection will not cause physical injury or other adverse effects.

57. See *Continental Ore Co. v. Union Carbide, supra.*

58. See *United States v. Terminal R.R. Ass'n of St. Louis, supra,* 224 U.S. at 395, 32 S.Ct. at 510.

59. See *Hecht v. Pro-Football Inc., supra,* 570 F.2d at 992.

60. The term "harm" includes several disparate conditions, from the immediate and potentially drastic consequences of excess voltage to barely audible noise on the telephone line.

61. In this respect, defendants relied to some considerable degree upon the report of a panel of the National Academy of Science. That report is not yet in evidence for its truth, and its reliability has not yet been explored.

62. Foreign, agricultural, and other non-Bell-controlled equipment has always been attached to the network, apparently without causing substantial harm. The burden is on defendants to demonstrate that their "pollution" theory of incremental harms is valid.

some evidence to support these claims, there is also considerable evidence to the contrary.[63] Suffice it to say that on both of these issues, the government has made a more than adequate showing and that the burden falls upon defendants to refute that showing through their own proof.

Third, defendants argue that, inasmuch as a number of the individual episodes involve devices for which Western Electric did not manufacture a competitive model, no inference of anticompetitive intent or behavior could be drawn from the evidence of defendants' conduct contained in those episodes. But the theory of the government's case is not simply that the Bell System acted to smother competition with regard to particular pieces of equipment manufactured by Western Electric. Rather, the contention is that defendants' actions were designed to preserve Bell's anti-interconnection stance and thereby to prevent encroachment by other manufacturers upon markets (whether or not served by Bell) from which inroads could be made into Western's position as the dominant supplier of telecommunications equipment in the United States. For this purpose, the question of whether or not Western Electric actually manufactured a competing model of a particular device is of limited relevance.[64]

Fourth, defendants contend that the episodes containing evidence of the experience of individual competitors in the interconnect industry constitute an insignificant sampling of what occurred in that industry during the relevant period, and that they should be disregarded by the Court for that reason. However, the scope of this case is such that, were every single event having possible relevance to be presented before this Court, the trial might well extend beyond the lifetimes of all current participants. Hence, it is not surprising that the government chose to present evidence of

what it felt to be representative chapters in the relationship between the Bell System and those who sought to interconnect their equipment with the Bell network. There are at this time insufficient grounds for finding that these chapters are not representative.

The Court concludes that the evidence sustains the allegation that defendants have used their local exchange monopolies to foreclose competition in the terminal equipment market by refusing unreasonably to interconnect equipment not provided by the Bell System, or by unreasonably impeding such interconnection, and that neither the government's interconnection claim nor the subsidiary contentions relating thereto should be dismissed.

## IV

### Intercity Services Offered in Competition with AT&T Long Lines

The government's claims with regard to the intercity services offerings of non-Bell carriers revolve around one central point: that because the Bell System (with its Operating Companies) possesses a monopoly in the distribution of local telecommunications services,[65] meaningful competition in the provision of intercity services is precluded unless the non-Bell carriers are able to obtain interconnection with the Bell local distribution facilities under non-discriminatory terms and conditions. Long distance and other intercity lines are essentially useless unless they can be connected to the local switches from which both business and residential customers may be reached.

 A. It may be helpful at the outset to state the applicable legal standard. Any company which controls an "essential facility" or a "strategic bottleneck" in the market violates the antitrust laws if it fails to make access to that facility avail-

---

**63.** On AT&T's good faith, see, for example, Plaintiff's Exhibit 2064; on the business ability issue, see, e. g., testimony of Lowell Hoxie.

**64.** Additionally, the success of some general trade products for which there was no Western

counterpart (e. g., call restricters, episode 54) would have directly decreased AT&T revenues from intercity services.

**65.** See note 17, *supra.* The local monopoly is a lawful one.

able to its competitors on fair and reasonable terms that do not disadvantage them. *United States v. Terminal R.R. Assn. of St. Louis, supra; Otter Tail Power Co. v. United States, supra; Hecht v. Pro-Football, Inc., supra; Gamco, Inc. v. Providence Fruit & Produce Building, Inc.*, 194 F.2d 484 (1st Cir. 1952); *Woods Exploration and Producing Co., Inc. v. Aluminum Corp. of America*, 438 F.2d 1286, 1300–09 (5th Cir. 1971). Such access must be afforded "upon such just and reasonable terms and regulations as will, in respect of use, character and cost of services, place every such company upon as nearly as equal plane as may be." *United States v. Terminal R.R. Association, supra*, 224 U.S. at 411, 32 S.Ct. at 515.[66] In the view of the Court, it is clear that the local facilities controlled by Bell are "essential facilities" within the meaning of these

B. The government introduced testimonial and documentary evidence [68] tending to show that defendants have sought in a variety of ways to exclude the competition by restricting interconnection to the local facilities, as follows.[69]

First, during the period before the *Carterfone* decision (1940's–1960's) [70] the defendants, hoping to stave off the advent of intercity services competition made possible by the advances in microwave technology,[71] attempted to use the

decisions and that, to the extent that the antitrust laws provide the legal standards governing the conduct here at issue,[67] defendants are obligated to provide the kind of non-discriminatory access which the cases contemplate.

66. The meaning of that standard for purposes of this case is discussed in Part VI *infra*.

67. As to the issue of whether the antitrust laws or some other statutory scheme governs defendants' conduct in this case, see Part V, *infra*.

68. Evidence was introduced in conjunction with the following episodes: 10 (Early Video); 11 (New Demand—Above 890); 13 (Railroads); 17 (GE Microwave); 21 (MCI Application Proceeding); 22 (Specialized Common Carrier Proceeding); 23 (Initial MCI Negotiations); 24A & B (Interconnection Restrictions); 26 (Second Round MCI Negotiations); 27 (Docket 20099); 31 (New Demand for Domestic Satellites); 32 (Docket 16495 and AT&T's Satellite Application); 33 (Domestic Satellite Carriers); 34 (FX and CCSA Interconnection for Satellite Carriers); 35/36 (Datran: Demand for Digital Data, AT&T Regulatory Response); 37 (Datran: AT&T Market Response); 39 (Datran: Effects of AT&T Response).

69. Their practices in this regard may, depending upon the circumstances, be regarded as unlawful leveraging, tying arrangements, or refusals to deal. See *Otter Tail Power Co. v. United States, supra; Gamco Inc. v. Providence Fruit & Produce, supra*, 194 F.2d at 488; *Lorain Journal Co. v. United States*, 342 U.S. 143, 154–55, 72 S.Ct. 181, 186–87, 96 L.Ed. 162 (1951); *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *United States v. United Shoe Machinery Co., supra*.

70. Defendants argue that many of the allegations relating to these early intercity services claims are barred by the 1956 consent decree in *United States v. Western Electric Co.*, 1956

Trade Cas. ¶ 68,246 (D.N.J.1956) because the conduct at issue preceded the date of entry of the consent judgment. A consent judgment, like any other judgment, is *res judicata (Aluminum Company of America v. United States*, 302 U.S. 230, 58 S.Ct. 178, 82 L.Ed. 219 (1937)), that is, it binds the parties to the suit "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other matter which might have been offered for that purpose." *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195 (1876); *Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). The issue here is whether the instant action is sufficiently similar to the earlier case so as to trigger the application of the *res judicata* doctrine.

The 1949 complaint leading to the 1956 consent judgment did not charge that AT&T's dominance of telephone service violated the antitrust laws, but it only charged violations in the manufacture and sale of telephone equipment, and it sought the divestiture of Western Electric. The claims relating to intercity services in the instant suit have no counterpart in the earlier proceeding, and the relief sought with respect to these claims (*i. e.*, the divestiture of the Operating Companies) differs substantially from the relief sought by the government in 1949. Accordingly, the Court concludes that the services claims are sufficiently dissimilar from the claims advanced in the 1949 suit as to render the doctrine of *res judicata* inapplicable to the pre-1956 conduct alleged herein.

71. Prior to that time, when telecommunications depended wholly on cable, competition was, as a practical matter, not feasible.

interconnection provisions of their tariffs to compel all video transmissions to be made through AT&T facilities, to prevent interconnection of private microwave systems to the public switched network, and to terminate the liberalized interconnections traditionally afforded to the private networks of right-of-way companies.[72]

■ Second, after the *Carterfone* decision, defendants were able to erect a substantial barrier to entry into the intercity services market through the "customer premises" provision of their interconnection tariff. Under this provision, AT&T would interconnect its existing intercity facilities with those of a competitor only if the interconnection took place in switching equipment on the premises of the customer at a point where telecommunications either originated or terminated. One of the principal problems with this interpretation by AT&T of the tariff was that it had the effect of precluding competitors from entering the market on a gradual basis.

For example, when the General Electric Company (GE) sought to phase in its own switch and microwave system, with the goal of eventually replacing the nationwide common control switching arrangement (CCSA)[73] it had leased from AT&T with a GE-owned system, AT&T's insistence upon its view of the tariff ultimately forced GE to choose between leasing the entire CCSA system from AT&T or providing the entire network itself.[74]

The customer premises restrictions were also used to prevent Microwave Communications, Inc. (MCI) from serving customers through multipoint networks containing both AT&T's and MCI's circuits.[75] Essentially, these restrictions forced customers to use AT&T for intercity service even with respect to routes served by other companies if they wanted service on any connecting route which was served only by AT&T.[76]

---

72. The evidence introduced in support of these charges consists primarily of the stipulation paragraphs from episodes 10, 11 and 13 and materials from FCC proceedings in Dockets 8963, 9539, 11164, 11883, and 12940 (see Plaintiff's Exhibits 28, 29, and 47). By and large, the inferences of anticompetitive intent and conduct which the government asks the Court to draw from these materials involve the reasons behind various positions taken by defendants before the FCC in these dockets. As such, they may not serve as a basis of antitrust liability (see Part VII, *infra*). However, to the extent that the events portrayed in these episodes provide a historical context for AT&T's conduct in subsequent years, the Court will consider them for this limited purpose. It should also be noted that the government's evidence in regard to these episodes was not particularly strong.

73. CCSA service is used by large customers with extensive communications needs in multiple locations. It is essentially a smaller version of the public switched network, but it is dedicated to the use of a particular customer. Episode 1, stipulation paragraph 73; episode 17, stipulation paragraph A–10.

74. See episode 17; testimony of Bernard Overeynder.

75. This resulted in MCI's inability to serve Scientific Timesharing (STS), which wanted service from St. Louis to Bethesda, Maryland. At the time in question, MCI was equipped to provide service only from St. Louis to Chicago. In order that STS might be served on the remainder of the route from Chicago to Bethesda, a request was made to AT&T to allow interconnection with its circuits in Chicago. However, since STS had no premises in that city, AT&T refused to allow MCI circuits to interconnect with AT&T circuits at that point. As a consequence, if STS wanted service between St. Louis and Bethesda, it had to purchase service from AT&T not only between Chicago and Bethesda but also between St. Louis and Chicago (thus eliminating MCI altogether). See episode 24A; testimony of Laurence Harris.

76. The actions of AT&T with regard to the customer premises provision do not concern interconnection with Bell provided local distribution facilities but with AT&T intercity facilities. The government argues these actions to be illegal not under the essential facilities doctrine (see pp. 21–22, *supra*), but as the equivalent of unlawful tying arrangements—that is, that AT&T "tied" provision of the services for which it held a monopoly (i. e., service on routes for which competition had not developed) to purchase of AT&T service along routes which competitors did indeed serve. See *Northern Pacific Ry. v. United States, supra*, 356 U.S. at 5–6, 72 S.Ct. at 186–87; *Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275–76 (2d Cir. 1979).

Third, defendants refused interconnection for foreign exchange (FX) [77] and CCSA service, first to the specialized common carriers and next to the domestic satellite carriers, until specifically ordered to do so by the FCC in 1974.[78] The *Specialized Common Carriers* decision of the FCC in 1971 had authorized the specialized carriers to provide private line services (29 F.C.C.2d 870 (1971)). Testimony by government witnesses tended to show that the private line services authorized by the FCC in that decision were considered in the industry to embrace FX and CCSA service, and that AT&T could not have reasonably believed that interconnection of these services with the network was not required as of 1971.[79] Other witnesses testified that the technical

objections upon which AT&T based its decision to exclude the domestic satellite carriers from the FX and CCSA interconnections tariffed for the other specialized common carriers in 1974 (see note 78, *supra*) were unfounded.[80]

Fourth, defendants attempted to deny competitors meaningful access to local distribution facilities by pricing access thereto discriminatorily,[81] by making the local distribution area arbitrarily small,[82] and by establishing other terms and conditions of access that both prevented competitors from offering desired types of service and left them in doubt as to whether the local facilities provided might not be precipitously withdrawn.[83]

77. FX service "permits a customer to make or receive local calls through a distant switching center by effectively providing a long extension cord in the form of a dedicated line between the customer's location and a telephone company switching system in the distant location (the 'foreign exchange')." Episode 1, stipulation paragraph 72.

78. AT&T was ordered to provide these connections to the specialized common carriers on April 23, 1974 (*Bell System Tariff Offerings*, 46 F.C.C.2d 413). In May of that year, a Bell tariff was filed excluding the domestic satellite carriers from these connections on the ground that there were technical obstacles. The FCC ordered AT&T to interconnect with the FX and CCSA service offered by the domestic satellite carriers on September 12, 1974 (48 F.C.C.2d 676).

79. With regard to the specialized common carriers, see testimony of William McGowan; Laurence Harris; with regard to the domestic satellite carriers, see testimony of Nathaniel Fthenakis, Allen Schwamberger, and Walter Pioli. AT&T's own Long Lines Intercity Services Handbook lists FX and CCSA under private line services. See Plaintiff's Exhibit 1745.

The government argues that, whether or not the *Specialized Common Carriers* decision authorized the provision of FX and CCSA service under the Communications Act, AT&T was still obligated to provide interconnection for such services under the essential facilities doctrine of the antitrust laws. See pp. 1352–1353, *supra*. Much of the evidence presented by the government, however, dwelled on the question of whether the FCC decision did authorize such services, whether AT&T believed this to be the case, and whether AT&T therefore should have understood itself to be obligated to provide interconnection for these services.

Defendants have strenuously argued—and attempted to establish through cross examination—that it was unreasonable for anyone to believe that these services were authorized prior to 1974. However, on that issue, too, the government has to this point clearly carried its burden of proof.

80. See testimony of Eugene Cacciamani. Bell claimed that FX and CCSA interconnection with the satellite carriers was technically infeasible due to a "double hop" problem that would reduce the quality of the transmission by causing delays and echoes. According to the evidence presented thus far, the possibility of a double hop problem actually occurring is remote.

81. The government's evidence tended to show that, for example, AT&T charged higher prices for local distribution facilities to MCI than to Western Union. See, *e. g.*, Plaintiff's Exhibits 1455, 1526; testimony of Laurence Harris, William McGowan.

82. This prevented the non-Bell carriers, such as MCI, American Satellite Corp., and RCA Globcom, from serving any customer who happened to be located outside these narrowly-drawn areas. See testimony of William McGowan, Laurence Harris, John Jackson, Allen Schwamberger.

83. The draft contract offered to the domestic satellite carriers for the provision of local distribution facilities (Plaintiff's Exhibit 425) made available to these carriers voice grade facilities only; carriers such as American Satellite Corp. and RCA Globcom had intended to offer not only voice service, but also video and data transmission by satellite, and the contract restriction prevented them from doing so. In

Fifth, AT&T conducted negotiations with competitors as to the possibility and terms of interconnection in bad faith, stringing the competing carriers along for long periods with groundless technical objections, intermittent delays and occasional concessions, and then inexplicably reverting to earlier positions, repudiating previously negotiated compromises, or unilaterally ceasing negotiations.[84]

Sixth, in the face of Datran's public commitment to a digital data network (after Bell had considered and rejected the notion of offering such a service itself), the Bell System engaged in a crash development program for a competing Bell service, the Digital Data Service (DDS), preannounced its availability, and conducted an intensive marketing "blitz" over a period of two years before it was available. The result of these activities, according to the government, was the demise of Datran, which could not compete either with the DDS price (see notes 118 and 122, *infra*) or with the DDS fervor created by Bell's preannouncement and marketing campaign, which had the effect of discouraging investors from financing Datran.[85]

Finally, with regard to the offering of MTS/WATS-like service (*i. e.*, service similar to Bell's common long distance service (MTS) and its wide area telephone service (WATS)), there was testimony to the effect that AT&T attempted to block MCI from offering its long-distance metered service (Execunet, tariffed initially in 1974), even though the interconnections used by MCI for this service did not differ from those used for FX or CCSA service.[86] When the Court of Appeals for this Circuit held that "the Commission decisions in *Specialized Carrier* and *Bell System Tariff Offerings* [see note 78, *supra*] impose upon AT&T an obligation to provide interconnections for Execunet,"[87] AT&T filed a new tariff with the FCC, known as ENFIA (Exchange Network Facilities for Interstate Access), which raised the rates charged to MCI for

addition, AT&T undertook in this contract to provide local facilities "to the extent *in its judgment* such facilities are available over and above its operating needs" (emphasis added). Plaintiff's Exhibit 425, p. 4. Witnesses testified as to their apprehension that this provision left AT&T with excessive discretion to deny them the use of local facilities at any time. See testimony of John Jackson, Walter Pioli, Allen Schwamberger.

84. For example, after two years of negotiation between AT&T and General Electric with regard to GE's proposal to replace part of its AT&T-leased CCSA system with one of its own, the negotiators finally reached a compromise on the technical and operational problems AT&T found with the proposal; much to GE's surprise, however, AT&T management repudiated the compromise and returned to the position initially held by AT&T before negotiations had begun. See generally episode 17; testimony of Bernard Overeynder.

Similarly, the history of contract negotiations between AT&T and MCI in connection with the provision of local distribution facilities during 1972 and 1973 demonstrate a pattern of delays and shifts in position by AT&T, culminating in AT&T's discontinuation of negotiation late in 1973 and its decision instead to file tariffs at the state level for the provision of local facilities. This decision appears to have been taken with the expectation that it would force MCI to litigate the lawfulness of the tariffs before some twenty state regulatory agencies. See generally episode 22; testimony of Laurence Harris.

Evidence was also presented demonstrating AT&T's lack of cooperation and vacillation during negotiations for the provision of local distribution facilities with the domestic satellite carriers (see generally episode 32; testimony of John Jackson, Allen Schwamberger), and during the ENFIA II negotiations in 1979–80 on the type of interconnections available for long-distance metered service (see testimony of Bert Roberts, Edgar Kushan).

85. See episodes 35/36, 37, 39; testimony of Edvin Farinholt and Ralph Johnson.

86. Testimony of Bert Roberts. Much of the government's evidence with regard to AT&T's initial opposition to MCI's Execunet tariff involves the position taken by AT&T before the FCC and, later, before the U.S. Court of Appeals for this Circuit. See, e. g., Plaintiff's Exhibits 2244. These activities cannot serve as a basis for antitrust liability and will not be so considered by the Court. See Part VII, *infra*. The Court makes reference to AT&T's opposition here only by way of background. See note 72, *supra*.

87. *MCI Telecommunications Corp. v. FCC*, 580 F.2d 590, 597 (D.C.Cir.1978) [*Execunet II*]; see also *MCI Telecommunications Corp. v. FCC*, 561 F.2d 365 (D.C.Cir.1977) [*Execunet I*].

its Execunet connections to 3½ times what MCI had previously been paying for substantively identical FX connections.[88] Negotiations between AT&T and non-Bell carriers resulted in an agreement upon an interim rate of approximately 1½ times the FX rate. This ENFIA rate has been in effect since April, 1979.[89]

The government also showed in that regard that under existing ENFIA arrangements, the non-Bell carriers receive treatment that differs from that afforded AT&T's own Long Lines with respect to type, quality, and price of interconnection, precluding these carriers from serving certain types of customers, and causing inconvenience to the customers that these carriers do serve.[90] Witnesses testified to difficulties in obtaining cooperation from the Operating Companies (with whom the carriers must interconnect and deal) with regard to deliveries, installations, and repair procedures, and to the fact that the Operating Companies generally treat the non-Bell carriers as competitors, rather than as companies which, like the Bell System's own Long Lines Department, offer services complementary to their own.[91]

This recitation of events should not be read to imply that defendants do not con-test the facts established by the government's evidence or the inferences and conclusions that may be drawn therefrom. Indeed, they do. But evidentiary refutations, if any,[92] will have to await the introduction of defendants' own proof.[93] The Court finds that, as of now, sufficient evidence has been adduced to dictate the conclusion that AT&T has monopolized the intercity services market by frustrating the efforts of other companies to compete with it in that market on a fair and reasonable basis.

V

*Relationship Between Antitrust and Communications Laws*

While, as indicated, defendants vigorously contest the various factual premises for the government's intercity claim, the central focus of their defense to that claim is that, in placing limitations on the interconnections permitted to non-Bell carriers, AT&T acted reasonably under the standards of the Communications Act. Basically, it is defendants' theory that, even if they are not immune from the antitrust laws by virtue of the regulatory scheme of the Communications Act (see Part I–C *supra* ), the FCC has, in one form or another, permitted

---

**88.** Testimony of Bert Roberts; see testimony of Edgar Kushan, (with regard to ENFIA rates imposed upon Southern Pacific's Sprint Service).

**89.** Testimony of Bert Roberts.

**90.** Among other things, the non-Bell carriers are precluded from serving customers with rotary dial telephones; a customer must dial twenty-three digits in order to complete a call (whereas Long Lines customers need dial only ten or eleven digits); transmission quality is inferior to that offered by Long Lines; and answer supervision is unavailable. See testimony of Bert Roberts, Edgar Kushan, Gus Grant.

**91.** See testimony of William McGowan, Gus Grant, George Vasilakos. There was testimony to the effect that as long as Long Lines and the Operating Companies remained part of the same integrated structure, meaningful competition in the intercity service area between Long Lines and the non-Bell carriers was unlikely due to the strong loyalties to the Bell System within the Operating Companies. See, *e. g.*,

testimony of Gus Grant. Defendants argue that there is no policy encouraging non-cooperation on the part of the Operating Companies, and that the government has singled out unrepresentative instances where problems arose, and they will, of course, be permitted to prove in their own case that Bell policies counsel cooperation and that the instances cited by the government are atypical.

**92.** Beyond those that may be inferred from the answers of witnesses to cross-examination.

**93.** This might include, among other things, proof to support defendants' claims that the *Specialized Common Carriers* decision of the FCC was so unclear that they did not know that they were required to provide FX and CCSA interconnections to the carriers; that their guidelines for local distribution areas were not unreasonable; and that certain of their competitors (such as GE and MCI) had primary objectives other than the securing of the interconnections and services requested from Bell.

the interconnection practices now alleged by the government to be illegal, and that on this basis these practices must be deemed "reasonable" under the antitrust laws. In that view, the Communications Act [94] provides a scheme for the determination of the public interest (and hence of reasonableness) which has as its central premise the right of a carrier to refuse a request to interconnect unless and until the FCC has determined that the interconnection is in the public interest and should be made. Defendants argue that their actions in refusing or in restricting interconnection have stemmed from their striving to protect the public interest as they understood it to be perceived by the FCC.[95]

A related defense contention is that AT&T's imposition of interconnection restrictions was reasonable in light of the need to protect the public against "creamskimming" by non-Bell carriers—that is, the need to prevent competitors from preempting high-density, low-cost routes, leaving Bell with the low-density, high-cost routes.[96] In defendants' view, creamskimming is a problem because of the system of rate-averaging that calculates rates on a per-mile basis regardless of demand for service over a particular route, and regardless of differences in costs over different routes. If non-Bell carriers were allowed to concentrate on the low-cost routes, charge non-averaged prices, and thereby creamskim AT&T's revenues, the inevitable result, according to defendants, would be that Bell would have to increase the rates it charges to the remainder of the public.[97] Defendants claim that the use of interconnection restrictions to prevent creamskimming is an approach approved by the FCC in the past as in the public interest,[98] and that they acted reasonably by perpetuating these restrictions in order to protect the public from increases in the price of local service (see note 97, *supra*).

The government paints a wholly different picture, as follows. The defendants' variant of a "rule of reason" is inapplicable.[99]

**94.** Section 201(a) of the Communications Act provides that

It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes. 47 U.S.C. § 201(a).

**95.** Defendants note that they have provided interconnection whenever ordered to do so by the Commission or the courts.

**96.** One method used by AT&T to guard against creamskimming was the "customer premises" restriction (see p. 23, *supra*) by which AT&T attempted to prevent competitors from "piecing out" those sections of a particular telephone route for which service was technically easy and inexpensive to provide, while leaving Bell with the burden of providing service on the technically complicated and expensive portions of that route.

**97.** According to defendants, if they did not average rates, but instead priced both high and low density routes according to costs, their local services prices would increase substantially, thus harming the majority of telecommunications consumers and the public interest. Such deaveraging, according to defendants, would also permit them to drive other intercity carriers from the market due to defendants' alleged economies of scale.

**98.** In support, defendants cite the *Above 890* decision of the FCC where the Commission rejected AT&T's creamskimming argument on the ground that the restrictions on interconnection in the Bell tariffs would prevent any expansion of private microwave systems that might result in creamskimming. See episode 11, stipulation paragraph 43. More recently, however, the FCC has explicitly rejected AT&T's creamskimming argument. See the FCC's decision in the *MCI* case (episode 21, stipulation paragraph 42); and the *Specialized Common Carriers* proceeding (episode 22, stipulation paragraph 17).

**99.** "Under the Sherman Act rule of reason . . . there is simply no such thing as 'reasonably' anticompetitive conduct . . . AT&T's argument is tantamount to an invitation to the Court to create a new rule of reason based not on the competitive effects of the conduct but rather on whether AT&T's conduct was reasonably believed to further its own 'reasonable' corporate goals." (Plaintiff's Memorandum, p. 63).

Regardless of whether or not the FCC has ordered interconnection with Bell facilities, and regardless of how AT&T appraises the public interest under the Communications Act, AT&T has a continuing obligation under the antitrust laws to permit interconnection if failure to interconnect is inconsistent with Sherman Act requirements. Compliance with the standards of the Communications Act does not in any way relieve defendants (or anyone else) of the obligation to comply with the antitrust laws. And it is significant that the FCC has never prohibited AT&T from making the interconnections requested by the competition; it has simply left Bell free to choose either to interconnect or not to interconnect.[100]

These differences in approach create a substantial dilemma. Adoption by the courts of the government's theory could well end up undermining the operation of the Communications Act, for the delicate mechanism by which the FCC determines which developments in the telecommunications industry might best serve the public interest would be thwarted if AT&T had a continuing obligation to interconnect before the Commission had even had an opportunity to rule.[101] On the other hand, if defendants' view of the law on this issue were ultimately to prevail, AT&T would, in practical terms, have achieved precisely that immunity from antitrust scrutiny which this Court and many other tribunals have already rejected as not being consistent with the will of Congress. See Part I–C, *supra*. There is also the consideration that, as several witnesses (including the former chief of the FCC's Common Carrier Bureau) have testified, that agency may realistically be incapable of effectively regulating a company of AT&T's size, complexity, and power.

The Court will defer choosing at this time which of these two very different views of the relationship between communications law and antitrust law is correct for purposes of this case. See *Weissinger v. United States, supra.* The question is obviously a difficult one, and there is little judicial precedent to guide the Court.[102] More im-

---

**100.** In that view, since the FCC has traditionally left the establishment of terms, conditions, and prices for interconnection to voluntary negotiation among the carriers, and since the FCC regards the Communications Act in the circumstances of this case as "neutral" (FCC Memorandum as Amicus Curiae, 62 F.C.C.2d 1102, 1112–13 (1977)), the antitrust laws apply unimpaired. It presumably follows that, unless defendants are able to demonstrate that they were *precluded* by the FCC (acting under Communications Act standards) from interconnecting, they had an obligation to interconnect if failure to do so was anticompetitive under the Sherman Act.

**101.** The government's theory also brings to the surface some practical problems. For example, the "continuing obligation" approach advocated by the government makes it difficult to pinpoint exactly when AT&T's failure to interconnect first gave rise to antitrust liability. Was it when the first requests for interconnection were made by the non-Bell carriers? When the FCC first authorized the carriers to offer a particular service? When the FCC first ordered interconnection to take place? When the Court of Appeals issued the *Execunet II* decision? It is not possible to ascertain from the government's submissions which of these alternatives it espouses.

**102.** The case law does not squarely support the theory advanced by either side. The only deci-

sions cited dealing with the implications of a refusal to interconnect are *Mid-Texas Communications, supra* and *Execunet I* and *Execunet II, supra.* In *Mid-Texas*, the Court of Appeals for the Fifth Circuit stated that a refusal to interconnect may be protected from antitrust scrutiny if Bell believed that the interconnection would be adverse to the public interest, and if its assessment of the public interest was correct. See 615 F.2d at 1388. This decision appears to place initial responsibility for determining the public interest consequences of an interconnection request on AT&T pending final ruling by the FCC. Yet the two *Execunet* decisions of the Court of Appeals for this Circuit, taken together, appear to provide that non-Bell carriers have the right to implement new services (and that AT&T has the obligation to provide the interconnections necessary for such implementation) unless and until the FCC determines the services to be unauthorized as not in the public interest. See *Execunet II, supra,* 580 F.2d at 593–98; *Execunet I, supra,* 561 F.2d at 380. Under these decisions, AT&T must interconnect until the FCC determines what is in the public interest, rather than relying on an initial public interest determination of its own.

It should be noted, however, that the *Execunet* decisions do not address the Bell System's responsibilities under the antitrust laws; while the *Mid-Texas* case does state that a decision not to interconnect is subject to antitrust scru-

portantly, it is a question which need never be reached should defendants, when put to their proof, be unable to support their claims of reasonableness with evidence on the record under either body of law. (For example, the existence of the economies of scale, general cost differentials, or threats of creamskimming have yet to be proved, as they must be if defendants are to show that their struggle against interconnection has in fact been reasonable under the standards of the Communications Act). Therefore, just as the government has been given the opportunity to prove its case in accordance with the legal theories it regards as applicable, defendants will be permitted to introduce evidence in support of their theory that they did, in fact, comply with the regulatory standards and directives. Should they succeed in that effort, it will be time enough to examine the communications-antitrust law issue on the basis of a full record and possibly further briefing in a more focused manner.

## VI

### Interconnection Standards

The parties are in sharp disagreement on the question of the standard to be applied by the Bell System in providing interconnection to competing carriers.

Defendants appear to concede that they are now obliged to provide interconnection to the non-Bell carriers offering MTS-like service—both under the *Execunet II* decision and under the essential facilities doctrine of the antitrust laws. However, they differ with the government as to how the essential facilities doctrine should be applied. The government argues that AT&T is required to afford interconnection to the non-Bell carriers on terms of "parity" with those interconnections now enjoyed by Long Lines, while defendants contend that the essential facilities doctrine entitles Long Lines' competitors not to parity but

only to the use of facilities, essential for their service, on a reasonable basis.[103]

The government has not shown, according to defendants, that parity of interconnection would be reasonable. In the first place, they argue, there is no record presently before the Court upon which it could even arrive at a definition of parity, much less determine how such parity might be achieved. Moreover, they contend, what the government requests could not be accomplished without severe damage to network coordination; in order to avoid any taint of discrimination, AT&T would be forced to coordinate with no one, if only because individual coordination with everyone—with their various conflicting demands—would simply be impossible.

■ The Court has concluded that absolute equality of access to essential facilities, without regard to the feasibility of such access or the burden it would impose upon the owner of the facilities, is not mandated by the antitrust laws. The Supreme Court ordered the defendants in *United States v. Terminal R.R. Ass'n, supra,* to provide for the use of essential facilities by their competitors "upon such just and reasonable terms and regulations as will ... place every such company upon as nearly as equal plane as may be ... as that occupied [by defendants]." 224 U.S. at 411, 32 S.Ct. at 515. That was not a requirement of absolute equality of treatment. Similarly, in the leading case in this Circuit concerning the essential facilities doctrine, *Hecht v. Pro-Football Inc., supra,* Judge Wilkey wrote for Court of Appeals that

> this principle must be carefully delimited: the antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately. 570 F.2d at 992–93.

tiny if the purpose is anticompetitive in that "an antitrust court has an important role in preventing misuse of the public interest standard." 615 F.2d at 1380.

103. Defendants conceded at oral argument that at this point Long Lines and its competitors are not treated on fully equal terms with regard to the interconnections they receive. Tr. 13063–64.

■ In short, problems of feasibility and practicability may be taken into account by the Court in determining the sufficiency under the law of the access to essential facilities granted by defendants to non-Bell carriers. To put it another way, parity is not necessarily required.

But it does not follow that, as defendants request, this portion of the government's case must be dismissed. The government has shown (and defendants concede) that AT&T and its subsidiaries now discriminate between Long Lines and non-Bell carriers with regard to access to Bell System facilities. It has also shown this discrimination to be anticompetitive in its effect. The burden is now upon defendants to show why, despite that anticompetitive impact, such unequal treatment is reasonable, whether because of technical infeasibility or otherwise.

## VII

### Regulatory Conduct and the First Amendment

Defendants contend that the *Noerr-Pennington* doctrine [104] shields them from liability on account of their participation in certain regulatory proceedings involving intercity services.[105] That doctrine has its genesis in basic public policy. As Justice Black noted for the Court in *Noerr* (365 U.S. at 137–8, 81 S.Ct. at 529–30),

... a holding that the Sherman Act forbids associations for the purpose of influencing the passage or enforcement of laws ... would substantially impair the power of government to take action through its legislature and executive that

operate to restrain trade. In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose that would have no basis whatever in the legislative history of that Act. Secondly, and of at least equal significance, such a construction of the Sherman Act would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to evade these freedoms.... For these reasons, we think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws.[106]

The government argues that in each of the areas under consideration defendants acted in bad faith, making false and groundless claims before the FCC in order to frustrate or delay the entry of competitors into the markets, and that these activities are for that reason encompassed in the so-called "sham exception" to the *Noerr-Pennington* doctrine expressly recognized in

---

**104.** *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

**105.** Episodes 10 (Early Video), 11 (New Demand/Above 890), 21 (MCI), 22 (SCC Proceeding), 31 (Domsat-New Demand), and 35/36 (Datran). As for those episodes noted in a footnote in defendants' motion to dismiss (episodes 20, 32, 33, 40), neither party has made specific arguments as to the application of the doctrine to any contentions. Indeed, it appears

that there are few, if any, subjects in those episodes that could conceivably raise *Noerr-Pennington* considerations. Unless defendants identify with particularity those contentions as to which they claim that a *Noerr-Pennington* defense exists within the guidelines supplied by this opinion, the Court will not further consider this issue with respect to these transactions. See also, note 117, *infra*.

**106.** See also *United Mine Workers v. Pennington, supra*, 381 U.S. at 669–70, 85 S.Ct. at 1592–93.

California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

In *Noerr*, the Court alluded to the possibility that "sham" use of the petitioning process for anticompetitive purposes might not receive protection from the antitrust laws. The sham exception was given full content when the Supreme Court in *California Motor Transport, supra*, distinguished between legitimately influencing public officials, on the one hand, and the effective barring of competitors from meaningful access to governmental bodies through manipulation, on the other. As the Court of Appeals for this Circuit said in *Israel v. Baxter Laboratories, Inc.*, 466 F.2d 272, 278 (D.C.Cir.1972), the sham exception reflects a basic concern for the integrity of the regulatory process and, for that reason, "no actions which impair the fair and impartial functioning of an administrative agency should be able to hide behind the cloak of an antitrust exemption."

In practice, the distinction between the legitimate dissemination of views and the manipulation of governmental processes for anticompetitive purposes has been difficult to draw, and in various cases the courts have come to conclusions that are not always easy to reconcile. A tension inevitably exists between the First Amendment concerns expressed by Justice Black in *Noerr* and the fact that, as Professor Robert Bork has noted in *The Antitrust Paradox*, pp. 347–49 (1978), "[p]redation by abuse of governmental procedures . . . presents an increasingly dangerous threat to competition . . . [and] offers almost limitless possibilities for abuse" and that therefore "[t]he antitrust laws [should] make a major contribution both to free competition and to the integrity of administrative and judicial processes by catching up with this means of monopolization."

The Court of Appeals for this Circuit recently prescribed rules to be applied in determining whether the sham exception is applicable. *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n*, 663 F.2d 253 (D.C.Cir.1981) was an action brought by a mail order prescription company against the national professional society of pharmacists with which state pharmaceutical associations and certain state boards of pharmacy examiners were joined as co-conspirators. *Noerr-Pennington* was pleaded as a defense, and the Court of Appeals held that all of the challenged activities were so protected. This decision rests upon several subsidiary holdings which have application here, as follows.

■■■ First, the sham exception is not satisfied by a mere showing of anticompetitive intent [107] or of a pattern of lobbying activities; there must also be proof that those being charged subverted the integrity of the governmental process, that they effectively barred access to it, or that the nature of the process made their invocation something other than political activity (see note 108, *infra*). Second, the sham exception clearly applies to attempts to influence governmental action through overtly corrupt conduct, such as bribes or misrepresentations, which are not normal and legitimate exercises of the right to petition but are subversions of the integrity of the process. Third, the exception also applies when the relevant activities were intended not to secure governmental action but to harm others through deliberate abuse of the governmental process. Fourth, *Noerr-Pennington* applies not only to governmental bodies acting in a political framework but also to regulatory agencies, the only exception being agencies which operate in a wholly economic framework (*e. g.*, that of government procurement contracts).[108]

---

**107.** See also, *Mid-Texas Communications Systems, Inc. v. Am. Tel. & Tel. Co., supra*, 615 F.2d at pp. 1382–87.

**108.** However, a distinction may be made on the basis of the type of governmental body involved (legislative or administrative) and the function it exercises (rule-making or adjudica-

tive) when the issue is whether a deliberate misrepresentation is protected, and those factors may also "shed light on whether the [parties being charged] were engaged in 'political activity . . . .'" (663 F.2d at p. 266).

■ Insofar as the instant case is concerned, it appears that, under the *Federal Prescription Service* guidelines, the government, to escape the *Noerr-Pennington* doctrine, must show that defendants subverted the integrity of the governmental process through misrepresentations or similarly unprotected conduct, or that they effectively barred their competitors' access to that process (*i. e.*, the FCC).[109] To the extent that such a showing has not been made, the various activities of defendants may not be used as evidence of liability.

■ Upon examination of the evidence adduced by the government in light of these guidelines, the Court holds that, with but one exception, all of AT&T's "petitioning" activities [110] which defendants claim to be protected by *Noerr-Pennington* are, in fact, protected by that doctrine.

■ Typical of the acts upon which the government relies are those related to the MCI initial application for authorization to construct a Chicago-St. Louis microwave system.[111] Bell argued to the FCC that there was no public need for the sharing and part-time use features of MCI's proposed service, while at the same time it was offering an experimental tariff (Series 11,-000) which included a sharing feature.[112]

Taken in the light most favorable to the government, this evidence indicates that in its advocacy AT&T did not indicate all of the relevant facts; but this is a far cry from being a misrepresentation in the "overtly corrupt conduct" sense required under *Federal Prescription Service*. Moreover, the representation was not one that defendants sought to conceal or that went unnoticed, and it clearly does not rise to the level of a "sham" so as to work an impairment of the fair and impartial functioning of the FCC.

Another typical incident is that relating to the application of the Collier Electric Company to relay video signals on a microwave system from Denver to three community antenna systems.[113] AT&T filed an opposition and a competing application (which presupposed the use of sites owned by Collier) even though at the time of the hearing on the applications AT&T had neither existing nor prospective customers available for its proposed service.[114]

■ In the Court's opinion, incidents of this character are insufficient to fit within the sham exception: the evidence shows little more than that Bell opposed new entrants, that it made contentions which were

109. Additionally, anticompetitive intent must be shown.

110. Defendants may have tangentially raised the *Noerr-Pennington* defense also with respect to matters which are conceptually wholly outside the scope of the doctrine. The Court's ruling herein therefore does not apply to AT&T's failure to propose a certification program for customer-provided equipment, for such conduct cannot conceivably be construed as petitioning for governmental action. (Of course, evidence of AT&T's position before the FCC in its certification docket no. 19528 does fall within the doctrine. See note 54, *supra*.) Likewise, the government is not precluded from using AT&T's participation in various regulatory proceedings to show that defendants were aware of the facts they stated in such proceedings, any inconsistency with positions taken elsewhere, the possible lack of a basis for positions taken elsewhere (*e. g.*, in negotiations with competitors), or the conduct of defendants following or in response to agency or court decisions.

111. Episode 21.

112. The FCC noted that AT&T's statements in support of the need for this tariff were "inconsistent with" and "would substantially undermine" AT&T's arguments in the MCI proceeding. Microwave Communications, Inc. (Docket No. 16509), 18 F.C.C.2d 953, 962 (1969).

113. Episode 10.

114. In a similar vein, the government points to evidence that AT&T raised technical problems in defense of its video interconnection tariff no. 216 (episode 10) but that the FCC ultimately found that such problems were not insurmountable; and to evidence with respect to another transaction indicating that AT&T's technical objections to interconnection with private microwave applications were not well taken (episode 11). The government seems also to complain of defendants' efforts to seek to delay implementation of the *Execunet I* decision, *supra*, through petitions for rehearing in the Court of Appeals and certiorari in the Supreme Court.

not wholly correct, and that the FCC ultimately ruled against Bell. The sham exception, as the Court of Appeals strongly suggested in *Federal Prescription Company*, must be narrowly construed so as not to chill the rights of individuals and corporations to access to courts and to legislative and regulatory bodies. This principle would be hindered by a ruling which exposed an entity to antitrust liability on the basis that an official body found its contentions to be unsupported by the facts or otherwise without merit. To be a sham, the representation must go beyond the normal and legitimate exercises of the right to petition; it must amount to a subversion of the integrity of the process. And, absent special circumstances, this standard is not breached unless there is evidence of a series of misleading statements, of representations having the effect of actually barring access to an official body, or of an intent to mislead the body concerning central facts. The Court finds that the Bell statements at issue here are not in any of these categories.

█ The one instance cited by the government which does, on the basis of the government's proof,[115] fall within this standard relates to the application of Datran to construct a nationwide digital network. It appears from the evidence that AT&T opposed an FCC application by Datran for authority to construct a nationwide network, claiming that Datran had not demonstrated a need for the proposed service and

that the economic and technical feasibility of the proposal was highly questionable. Internal Bell documents introduced into evidence revealed, however, that defendants recognized at that very time that the Datran proposal was "carefully planned" and "well financed"; that they viewed it as a threat to AT&T's monopoly in network transmission; and that, in their opinion, a strategy of delay was necessary, to be implemented by a petition to the FCC requesting a general inquiry into the public interest aspects of the subjects raised by the Datran application.[116] The Court can reasonably infer from this evidence that AT&T's sole purpose in opposing the Datran application was to preserve its monopoly and that it well knew that the positions it took before the FCC were baseless.

In short, with respect to the Datran episode, the government has presented sufficient evidence to remove defendants' activities from the shelter of the *Noerr-Pennington* doctrine, and the burden is upon defendants to rebut that showing. In all other respects, however, the defendants' *Noerr-Pennington* defense will be sustained.[117]

### VIII

### *Intercity Pricing*

The government has charged that defendants have priced their intercity services without regard to the cost of these services, on the following basis.[118]

---

115. Defendants will, of course, have an opportunity to refute that evidence.

116. AT&T documents note in this regard a course "which has proved popular with some commissioners, of raising a number of public interest questions which should be answered before the FCC determines its policy" and that AT&T officials were puzzled as to what grounds they might be able to find on which to oppose Datran's application. In an effort to avert speedy approval of the Datran petition AT&T argued both that there was no market for Datran's services and that AT&T was prepared to meet that market; yet, in fact, AT&T had no facilities with which to meet the market demands at that time. The FCC ultimately determined that there was a need for the service Datran proposed to provide, but Datran,

financially weakened by the delay as well as by other factors, was forced to declare bankruptcy. See p. 1356, *supra*.

117. Defendants may submit to the Court within fifteen days hereof a list of those government contentions which they consider to be encompassed within the ruling in this part of the opinion, and the government will have fifteen days to respond. Upon the Court's ruling thereon, the relevant contentions will be stricken and defendants will not be required to introduce evidence to controvert them.

118. The evidence adduced on intercity pricing concerns various AT&T private line tariffs, as follows:

One of the earliest tariffs in issue is a 1948 tariff for video transmissions. The rates

Subsequent to the time the *Above 890,* the *MCI,* and the *Specialized Common Carriers* decisions were issued the Bell System has had to contend with competition in the intercity private line services field, but prior to 1978 no such competition was allowed in the provision of MTS- or WATS-type service. Under these circumstances, the government claims, Bell had an incentive to set its prices high in the MTS and WATS areas (where it enjoyed a monopoly) and low in private line areas (where it was faced with competition) so as to exclude the existing competition and to deter further entry into the intercity services market.[119]

Bell accomplished its objective, according to the government, by deliberately pricing its intercity services without regard to their costs, with the objective of maintaining maximum flexibility for such cross-subsidization. Specifically, it is contended that Bell failed to calculate accurately the costs of providing intercity private line services or, to the extent that costs were calculated, to consider these costs in setting prices. From these failures, it is said, the Court may infer that Bell deliberately intended[120] to exclude competition on the basis indicated.

Defendants' principal responses to the government's pricing claim are (1) that the government's pricing-without-regard-to-cost theory fails to meet the standards established for violations of the antitrust

charged to the television networks were set without a detailed analysis of cost, and they remained unchanged until 1969 when there were readjustments both in the monthly rates and the occasional rates. In 1972, after AT&T had lost substantial revenues to its competitors because of the higher monthly rates, it filed another tariff that reduced monthly rates below the original 1948 rates.

The Multiple Channel Tariff, which became effective in 1956, offered discounted rates to telecommunications users for multiple channels between given points. After investigation by the FCC, the tariff was declared unlawful, and it was cancelled in 1963.

The Telpak tariff was implemented in 1961, at the same time that private microwave systems began developing after the FCC's *Above 890* decision. Telpak, too, provided discounted rates for customers using multiple channels. According to the government, the Telpak rates were based not on cost but on what AT&T believed to be the cost of building and operating a private microwave system. Although theoretically the tariff was designed to provide customers with multiple circuits between two given points, in reality such customers did not have to route even one private line circuit between those two endpoints. Telpak was thus entirely a "paper" network which allowed the Telpak customers to lower the costs of their private line needs. Moreover, because the incremental cost of additional circuits was minimal, customers had substantial incentives to satisfy all of their private line requirements through AT&T. The tariff expired by its own terms in May, 1981, after the Court of Appeals for this Circuit refused to review the objections raised by Telpak users who opposed the tariff's termination.

In 1969, while Telpak was the subject of an FCC inquiry, AT&T filed the Series 11,000 experimental tariff which permitted customers to lease specific networks within a seven-state area. The tariff was eliminated in 1972 after AT&T permitted the three-year experimental period to expire.

Another tariff in issue is AT&T's digital data service (DDS). In 1969, Datran applied to the FCC to develop a digital communications network through the use of a microwave system. In response to this competitive threat, AT&T began developing its own digital data transmission service (see p. 27, *supra*). The DDS tariff rates were 40 percent below those proposed by Datran.

In 1974, the FCC approved AT&T's Hi/Lo tariff which replaced the nationwide averaged private line rates with a two-level rate structure. Under Hi/Lo, rates were lowered in areas with high density use and raised in areas with low density use. According to the government, Hi/Lo was a preemptive rate cut, to be put in place before the specialized carriers became entrenched, and it was not based on reliable cost studies. In 1976, the FCC declared the Hi/Lo tariff unlawful. As a result, AT&T filed the Multi-Schedule Private Line Tariff (MPL), but the FCC ultimately found that tariff, too, to be unlawful.

119. This opportunity to subsidize competitive services with revenues from monopoly profits in the markets in which competition was foreclosed was and is particularly tempting, it is said, because defendants are regulated primarily with respect to their overall rate of return (as distinguished from regulation of the individual return for each of the services they provide).

120. The government does not allege that defendants' pricing practices constitute unlawful conduct, but only that they reveal anticompetitive intent. See Pretrial Brief, at pp. 60, 64, 66–67.

laws, is unsupported by legal precedent, and is meaningless under economic analysis, and (2) that, even if the charge is valid in principle, it is unsupported by evidence in the record. For ease of analysis, it is convenient to discuss these two defenses in inverse order.

A. The evidence adduced by the government with respect to intercity pricing falls into four general categories.

First, there is a catalogue of alleged abuses and deficiencies in defendants' private line service cost analyses, from which the Court is asked to infer a deliberate manipulation of cost calculations. In this regard, the government claims that, as one witness put it, defendants, rather than engaging in cost-based pricing, practice price-based costing. Thus, sometimes no cost studies were filed;[121] sometimes costs were inaccurately estimated;[122] sometimes cost studies were deliberately terminated;[123] and at other times no account was taken of predictable revenue effects of user shifts from one service to another.[124]

The government claims that these various manipulations bear upon the issue of defendants' intent to price anticompetitively because all of the errors tended to understate costs in competitive services and to overstate costs in services in which entry was prohibited, and because no firm which priced according to competitive factors could afford to, or would wish to, fail to determine its costs as precisely as possible. Defendants reply that the government's catalogue of deficiencies and abuses amounts to nothing more than "after-the-fact nit-picking and second guessing" (Memorandum at p. 462); but in the Court's view, the deficiencies are on the whole neither so trivial nor so poorly documented that they do not call for an explanation.

Second, the government offers numerous findings in decisions of the Federal Communications Commission to the effect that various cost studies submitted by AT&T to the Commission pursuant to tariffing were defective and, hence, inadequate to support tariff schedules.[125]

---

**121.** No such study was filed, for example, in conjunction with the Multiple Channel Tariff. In the case of the video transmission tariff, AT&T did not prepare a detailed cost study until after the video rates had been chosen.

**122.** The defects cited by the government as evidence of understatements of costs included the following items: overstatement of potential revenue losses to competitors; failure to consider Bell operating company plant; ignoring of higher cost plant; use of hypothetical mix of plant; use of capacity cost concept; unrelated depreciation estimates; allocation of joint costs among service classifications; residual averaging cost allocation; shifting direct costs to common cost categories; use of obsolete historical data; use of unrealistic forecasts; and relationship between design of rates and costs. See testimony of William Melody.

One example of the overstatement of costs is found in the DDS tariff. Datran attempted to lease high capacity data channel from AT&T after the latter had undercut Datran's proposed rates for low speed digital data service. The rates filed by AT&T for these high capacity channels (which Datran could lease only from AT&T) reflected not only the actual costs of these channels but also an additional amount that served as a contribution (presumably to common costs). Moreover, the contribution amount tended to be higher for the facilities that Datran intended to lease. The result was

that the rates were so high that it was economically impractical for any specialized common carrier, including Datran, to use the channels to create its own data transmission systems.

**123.** The cost methodology used by AT&T for the Hi/Lo tariff depended upon an accurate assessment of the response of the marketplace. Although AT&T admitted that a study of market behavior involving customer and account manager surveys was necessary to produce reliable cost data, the market information submitted by AT&T included neither customer surveys nor account manager involvement.

**124.** When pricing Series 11,000, AT&T set rates at twenty percent above its estimated costs, but the revenue gained from that tariff did not offset the revenues lost from other Bell services when customers shifted to Series 11,-000.

**125.** For example, the FCC found that the rate reductions for the Multiple Channel Tariff were not adequately cost-justified, and the cost data for the DDS and Hi/Lo tariffs were likewise questioned by the FCC. After the Hi/Lo tariff was found unlawful, AT&T filed the MPL tariff, again there was criticism of the cost analysis, and again the FCC found the tariff to be unlawful.

With respect to this evidentiary category, defendants argue that the FCC opinions and the criticisms contained therein are not probative because they were predicated upon findings that defendants had not satisfied their burden of proving the lawfulness of their tariffs, rather than upon decisions on the merits, and because they were based upon the Communications Act, not the antitrust laws.

With regard to defendants' first point, to the extent that the FCC made its findings with regard to Bell's cost studies in the context of holding that there had been a failure to meet a burden of proof (e. g., that a particular rate was compensatory), the Court has previously held the FCC's conclusions to be admissible only for the limited purpose of showing that such burden was not met (and not, e. g., to show that the rate was not compensatory). Although the Court would therefore not be justified in making inferences from such findings as to the compensatory nature of such a rate, inferences as to the sufficiency and reliability of the information furnished to the Commission are both justified and probative of the contentions advanced by the government. As for the question of the relationship between the Communications Act and the antitrust laws under which this action proceeds, it presents a complex legal question that permeates much of the case,

and it is one upon which the Court will not rule at this time. See Part V, *supra.*

Third, the government relies upon documents and statements indicating that defendants themselves believed that various of their services were priced lower than their costs.[126] Such evidence, of course, is clearly supportive of the government's theory.[127]

Fourth, there was evidence that Bell failed to consider alternative prices and to select among the alternatives the price that maximized the contribution from competitive services to the recovery of common costs,[128] and this, according to the government, evidences an intent to maximize market share by excluding competitors.[129] In defendants' view, the suggestion that profits ought to be maximized is inconsistent with the pro-competitive economic goals of the antitrust laws, and they claim that various alternative, non-exclusionary purposes explain the selection of prices that do not maximize profits. Although this point may ultimately turn out to be well taken, it is not so compelling as to form a basis for a dismissal at this stage. On an issue as uncharted legally and as complex economically as this one (see also Subpart B *infra*), the Court intends to avail itself of the testimony of defendants' expert and other witnesses[130] in addition to those of the government before reaching a final conclusion.[131]

---

126. There is evidence, for example, that when AT&T filed the 1972 video transmission tariff which lowered monthly rates below those charged in the original 1948 tariff, its own estimates predicted that there would be even greater losses during the first two years the new rates would be in use and that the anticipated profits in the third year would recover only twenty-five percent of these earlier losses. Other AT&T cost data and internal cost studies indicated that certain rates in the Telpak tariff would not recover costs. With regard to the Hi/Lo tariff, AT&T's own consultants and officials questioned the validity of the cost and rate assessments for the various routes.

127. The government has deliberately chosen not to rely upon predatory pricing in the traditional sense (such as pricing below cost, however defined) and any evidence which would support such an approach will be stricken. However, evidence that defendants believed

that they were pricing below cost is admissible on the issue of their anticompetitive intent.

128. See, e. g., the rate chosen for the 1969 increase in the Telpak tariff. This contention is equivalent to a claim that an unregulated firm failed to choose the price that maximized profits.

129. According to the government, Bell allocated an unrealistically low proportion of revenues from its competitive services to the common costs and that, were the proper figure used, the competitive services might well sustain a loss at the selected price.

130. Since the government is charging pricing without regard to cost rather than predatory pricing below cost, defendants do not have the onerous burden of demonstrating that their individual prices exceeded their individual costs; they must merely demonstrate that an anticompetitive purpose cannot be inferred from their

B. With respect to the legal and economic underpinnings of the government's pricing case, defendants argue that the "only accepted test for predatory pricing is whether rates were intentionally set at a level below marginal costs" (Defendants' Memorandum at p. 451), and that the government's failure to allege below-cost pricing therefore completely bars all of its pricing contentions. The Court will not sustain this argument at this juncture, for the following reasons.

In the first place, defendants overstate the extent to which the marginal cost test (or its surrogate, the average variable cost test), advanced by Areeda and Turner, in *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975), has become the sole legal standard for identifying non-compensatory pricing. Although courts have frequently incorporated these cost tests into their pricing analysis,[132] they have done so with the clear understanding that the relationship between prices and marginal (or average variable) costs is not the sole criterion appropriately considered to distinguish predatory from competitive pricing. *See, e. g., International Air Industries, Inc. v. American Excelsior Co., supra*, 517 F.2d at 724; *Pacific Engineering & Production Co.*

*v. Kerr-McGee Corp.*, 551 F.2d 790, 797 (10th Cir. 1977); *Janich Brothers, Inc. v. American Distilling Co., supra*, 570 F.2d at 857; *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 652 F.2d 917 (9th Cir. 1981).[133] Recent professional literature has likewise pointed to the fallacy of a mechanical application of a marginal or average variable cost test. See Williamson, *Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 284 (1977); Scherer, *Predatory Pricing and the Sherman Act: A Comment*, 89 Harv.L.Rev. 869 (1976); Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing*, 89 Yale L.J. 1 (1979); Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy*, 89 Yale L.J. 213 (1979).

C. Furthermore, and perhaps more significantly, although economists disagree on the frequency with which the phenomenon of predatory pricing occurs, the conditions under which it is likely to exist, and the indicia by which it may be detected, there is consensus that the term refers to "the deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition." 3 Areeda & Turner, *supra*, ¶ 771b, at p. 151.

pricing policies. They may do this, *e. g.*, by showing that these policies appropriately and reasonably took costs into account.

**131.** In a case finally brought to trial seven years after the filing of the complaint, it would be unwise not to spend the time in trial necessary for the defendants "to offer substantial additional testimony and documentary evidence demonstrating in detail, for each of the intercity studies attacked, the reasonableness of their studies and of the rates which were based upon these studies." See Defendants Memorandum at p. 472.

**132.** See, *e. g., Northeastern Tel. Co. v. Am. Tel. & Tel. Co., supra; California Computer Products, Inc. v. IBM Corp., supra*, 613 F.2d at 742–43; *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1358–59 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855–59 (9th Cir. 1977); *International Air Industries, Inc. v. American Excelsior Co.*,

517 F.2d 714, 723–24 (5th Cir. 1975); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 432 (7th Cir. 1980).

**133.** The only case cited by defendants that could be read as holding that pricing below marginal cost is the sole means for establishing a prima facie case of predatory pricing, *Hanson v. Shell Oil Co., supra*, has been interpreted otherwise by the Court of Appeals for the Ninth Circuit. See *Arizona v. Maricopa County Medical Society*, 643 F.2d 553, 559 n. 6 (9th Cir. 1980). As that court succinctly observed, in a passage in *California Computer Products v. IBM, supra*, 613 F.2d at 743, immediately following that cited by defendants:

And we do not foreclose the possibility that a monopolist who reduces price to some point above marginal or average variable costs might still be held to have engaged in a predatory act because of other aspects of its conduct.

■ Whatever may be the appropriateness of the marginal (or the average variable) cost test in such a context, the pricing phenomenon that is challenged in this action is quite different. The government does not allege an intertemporal shift in profits—a sacrifice of profits in the short-run in return for more than their recoupment in the long-run—but an inter-service shift. Specifically, it is claimed that the Bell System has engaged in pricing practices which allow it to sacrifice profits from one service and to recoup the lost profits during the same period in another service. In such circumstances, a pricing-without-regard-to-cost approach is not necessarily inappropriate, for the opportunity which a multiproduct firm subject to rate of return regulation has to cross-subsidize low prices for one product across other products (rather than across time) renders it far more likely to engage in anticompetitive pricing than the firm that must wait to hope to recoup its losses. See Posner, *Natural Monopoly and its Regulation*, 21 Stan.L.Rev. 548, 615–16 (1969). Because the likelihood that anticompetitive pricing will occur in a particular context is a salient—and perhaps the critical—factor affecting the choice of a standard for the legality *vel non* of the pricing, this increased probability of anti-competitive pricing may alone be a sufficient reason to relax a standard such as the marginal cost test, whose use is predicated upon the assumption that such pricing is unlikely. See Joskow & Klevorick, *supra*, at 215; Easterbrook, *Predatory Strategies and Counterstrategies*, 48 U.Chi.L.Rev. 263, 265–318.[134]

D. Defendants object that a pricing-without-regard-to-cost approach reverses normal procedure by imposing upon them the burden of proving that their pricing was reasonable. But such a conclusion would not necessarily be fatal to the government's theory, for a shifting of the burden of production of evidence may well be legitimate under certain circumstances.[135]

It is not necessary to decide that question, however, for the government's evidence is probative, at a minimum, on the issue of defendants' intent, and that is the purpose for which it is apparently being offered (see note 120, *supra*). To consider pricing-without-regard-to-cost evidence on this basis would not shift the burden of persuasion to defendants; it would merely be a recognition that, given the circumstances of this case, the evidence is ade-

---

134. Defendants have cited *Northeastern Tel. Co. v. Am. Tel. & Tel. Co., supra*, in which the Court of Appeals for the Second Circuit adopted a marginal cost test to evaluate claims of cross-subsidization in the telecommunications field similar to some of those advanced here. But that decision is not controlling, if only because the court there did not hold that no evidence short of that showing that price was below marginal cost was capable of establishing a pricing violation. The plaintiff in *Northeastern*, unlike the government in this case, was attempting to convince the court to apply a fully distributed cost test to the pricing dispute, and the Court of Appeals in essence simply selected the marginal cost standard over the fully distributed cost rule. Here, on the other hand, the Court is confronted with the pricing-without-regard-to-cost theory and evidence adduced based on that theory, and it must make its decision on that basis. See also *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp., supra*, 615 F.2d at 432. In any event, see Faulhaber, *Cross-Subsidization: Pricing in Public Enterprises*, 65 Am.Econ.Rev. 966, 969–70 (1975); *In re IBM Peripheral EDP Devices*, 481 F.Supp. 965, 994–95 (N.D.Cal. 1979).

135. See Joskow & Klevorick, *supra* at 261. That burden might appropriately be placed upon defendants in this context because (1) the Bell System probably sustains a higher proportion of common costs than any other business entity and the proper allocation of such costs may be more intractable than any other firm's, (2) the Bell System's costs appear to have proved impervious to ascertainment and hence to analysis by outsiders including the FCC, and (3) Bell possesses the rare opportunity to exploit these factors because of the regulatory scheme and the coexistence of competitive and entry-restricted services. Where those unusual—possibly unique—circumstances prevail, it may not be unreasonable to require the party being accused of anticompetitive pricing to produce evidence which demonstrates that its pricing practices were not designed either to drive out its competitors (in areas where there was competition) or to prevent or discourage entry (in areas where such entry was legally feasible).

quate to meet the government's initial burden of proving that defendants possessed anticompetitive intent. Certainly, the various practices catalogued *supra*, if ultimately believed by the Court to have occurred, would establish such an intent (even if they were not regarded as establishing predatory conduct).[136]

E. The government has presented, by its own admission, a novel approach. In response to the objection that its theory is unknown to either law or economics, it states in effect that the mapping of virgin territory is warranted by the uniqueness of the American Telephone & Telegraph Company, which is able to shift profits almost at will between monopoly and competitive services, and whose cost data are apparently impenetrable even to its own regulators. Although the government may not be able to rely upon direct legal precedent, it has presented persuasive theoretical underpinnings for its claim, and it has documented its allegations with extensive (if in places overly conclusory) testimonial and documentary evidence.

The Court may eventually conclude that only proof of predatory pricing in the sense in which that concept is employed in the *Northeastern Telephone Co.* line of cases will suffice to support a charge of violation of the Sherman Act [137] (or even the intent element of such a charge). However, in an area as fraught with uncertainty as the complex intercity service pricing question at issue in this proceeding, it would be unwise to truncate the hearing of these issues at this point. A dismissal at this stage based essentially upon the unwillingness of the Court to accept a novel legal and economic theory (which is certainly not so unpersuasive conceptually that it could not, in this factual setting, ultimately find acceptance, either here or on appeal) would entail the real risk of a retrial of the entire case. Since the Court has the option under Rule 41(b) to defer ruling on the motion, or portions thereof,[138] until all the evidence has been received, that course seems the more appropriate one, and it is the one the Court will follow.

## IX

### Bell Procurement of Equipment Manufactured by the General Trade

The government's general "procurement" charge is that defendants reinforced and exploited the Bell Operating Companies' structural incentives to purchase equipment, without regard to quality or price, from Western Electric instead of from non-Bell sources (known as the general trade suppliers) and that they thereby anticompetitively foreclosed competition.[139]

A. The government's proof is divided into seventeen episodes. Sixteen of these contain evidence of the experiences of general trade manufacturers attempting to sell their products either to Western Electric (for later sale to the Bell Operating Companies) or directly to the Operating Companies.[140]

136. The government, of course, would still have the burden of establishing such conduct—and hence a Sherman Act violation—with other, independent evidence.

137. A principal purpose of the antitrust laws is to promote price competition. Any rule which restricts anyone (including a monopolist) from engaging in vigorous competition would deter the very action that is intended to be encouraged (see *Berkey Photo v. Eastman Kodak Co.*, supra, 603 F.2d at 273; *Schine Chain Theaters v. United States*, supra, 334 U.S. at 120, 68 S.Ct. at 953). For that reason, the courts must exercise great care in differentiating between legitimate price competition and predatory pricing. See *Janich Brothers, Inc. v. American Distilling Co.*, supra, 570 F.2d at 856.

138. See the decisions cited at pp. 1342–1343 *supra.*

139. The market issues governing the procurement claim are discussed in Part X *infra*, and a related claim—that defendants improperly priced Western products in order to defeat competitive producers—in Part XI *infra*.

140. These episodes are: 55B & C (Data modems distributed by Vadic, Codex and Racal-Milgo); 59 (Ericofon one-piece telephone manufactured by Northern Electric); 61 (Key Systems manufactured by TIE and ITT); 62 (Linecards manufactured by ITT and San-Bar); 63 (Transfer Keys manufactured by Crest Industries); 64 (PBXs manufactured by Nippon Electric, ChesTel, ITT, Northern Telecom and oth-

This evidence tended to show that the general trade manufacturers encountered a considerable number of obstacles in trying to design equipment for, and to sell this equipment to, the Bell Operating Companies, and that these obstacles perpetuated a buy-Western bias. For example, the competitors had difficulty in locating the employee in Western or the Operating Companies authorized to negotiate a sale;[141] in obtaining from Bell compatibility specifications (without which general trade products could not be designed for interconnection with the Bell network);[142] and in persuading Bell Labs to complete objective evaluations (which were usually required before sales could be effected).[143] The government's evidence further indicated that Bell did not authorize the purchase of the general trade equipment even if no Bell product of equivalent quality, cost, or technical sophistication was available;[144] instead, crash programs were initiated to develop competing Western products[145] (to the extent that, in one instance, Western literally copied the general trade product so that it did not need to wait for the design and development of its own model).[146] Operating Company employees were under pressure from AT&T officials to buy from Western (even when a general trade product was cheaper or of better quality) or to wait until a Western product comparable to the desired general trade equipment was available,[147] and they were required to provide detailed justifications for general trade purchases which were not necessary for the purchase of Western equipment.[148]

The evidence supporting the seventeenth episode, the "umbrella" package,[149] shows that, despite a stated policy to the effect that the Operating Companies were to buy the best quality equipment at the lowest

ers); 65 (Automatic Call Distribution Systems manufactured by Collins); 66 (Crossbar Community Dialing Offices manufactured by Nippon Electric, Hitachi); 67 (Crossbar Community Dialing Offices, less than 500 lines, manufactured by Northern Electric); 69 (Automatic Number Identifiers manufactured by ITT); 72 (Alarm Monitors manufactured by Moore Systems); 74 (Traffic Monitoring Systems manufactured by Telesciences); 75 (Longhaul Microwave manufactured by Collins); 76 (Analog Multiplex Equipment manufactured by Lenkurt); 78 (Digital Carrier Systems manufactured by ITT); 79 (Shorthaul microwave manufactured by Lenkurt).

141. See episodes 62 and 72.

142. See episodes 55B, 55C, 64 and 78. It should also be noted that a general trade manufacturer could not even to have his product considered for sale to the Bell Operating Companies unless it submitted detailed information about the product to the Bell System for evaluation. Testimony showed that this information can be used by Western to its own competitive advantage. See testimony by George Woodruff, evidence introduced in conjunction with episode 65.

143. See episodes 61, 63, 64, 69, 72, and 78. This problem grew worse instead of better after the Bell System Purchase Products Division (BSPPD) was created in 1975, ostensibly as a centralized liaison between the Operating Companies and the general trade, for they added another, confusing layer to the authorization process. See episodes 63, 65, and 78. There is evidence that the establishment of the BSPPD was merely a cosmetic change in implementation of the long-term goal of maximizing the amount of products manufactured within the Bell structure. See Plaintiff's Exhibits 1351, 3128, and 3130; testimony of William Browne.

144. See episodes 55B, 55C, 62, 65, 66, and 76.

145. See episodes 61, 64, 65, 66, 67, 69, 74, and 78.

146. See episode 64 (evidence concerning the NA–409 PBX manufactured by Nippon).

147. See episodes 61, 64, 75, and 79. In one instance, AT&T officials appear to have directly intervened in the purchasing decision of an Operating Company, with the result that there was a substantial delay in purchasing until the comparable Western model was marketable. See episode 78 (concerning the experiences of ITT and the New York Telephone Co. with regard to the installation of digital channel banks in the World Trade Center).

148. See episodes 64, 72, and 75. Bell also preannounced the Western versions of general trade product long before they were actually marketable in order to forestall sales by the general trade. See episodes 61, 63, 74, and 78.

149. Episode 57.

price regardless of source,[150] the structural relationship among the various components of the Bell System generated a pro-Western, or in-house bias in the Operating Companies' purchasing practices.

The government's evidence has depicted defendants as sole arbiters of what equipment is suitable for use in the Bell System—a role that carries with it a power of subjective judgment that can be and has been used to advance the sale of Western Electric's products at the expense of the general trade.[151] First, AT&T, in conjunction with Bell Labs and Western Electric, sets the technical standards under which the telephone network operates and the compatibility specifications which equipment must meet.[152] Second, Western Electric and Bell Labs (most recently through the BSPPD) serve as counselors to the Operating Companies in their procurement decisions, ostensibly helping them to purchase equipment that meets network standards.[153] Third, Western also produces equipment for sale to the Operating Companies in competition with general trade manufacturers.

The upshot of this "wearing of three hats" is, according to the government's evidence, a rather obviously anticompetitive situation. By setting technical or compatibility standards and by either not communicating these standards to the general trade or changing them in mid-stream, AT&T has the capacity to remove, and has in fact removed, general trade products from serious consideration by the Operating Companies on "network integrity" grounds. By either refusing to evaluate general trade products for the Operating Companies or producing biased or speculative evaluations, AT&T has been able to influence the Operating Companies, which lack independent means to evaluate general trade products, to buy Western. And the in-house production and sale of Western equipment provides AT&T with a powerful incentive to exercise its "approval" power to discriminate against Western's competitors.

■ B. Defendants' response to all of this is that, in practically every case, the purchasing decision of Western or of the particular Operating Company was made pursuant to reasonable engineering and sound business judgment which should not be second-guessed by the Court. Stating this obviously does not make it so, however. It may well be that defendants will be able to refute the government's procurement evidence [154] and the inferences which may appropriately be drawn therefrom. But the Court holds that on this record a showing has been made which, unless it is rebutted, would support the conclusion that defendants have engaged in anticompetitive conduct in their procurement practices, in violation of the law.[155]

C. Defendants also advance three legal arguments in opposition to the govern-

---

**150.** This policy was announced in connection with proceedings in Phase II of FCC docket no. 19129. See Plaintiff's Exhibit 3150.

**151.** See testimony of George Woodruff. The standards themselves are justified by the need to maintain network quality.

**152.** See testimony of Stephen Deschaine.

**153.** Largely because of this centralized counseling function, the Operating Companies have never had to develop their own capabilities for independently evaluating general trade products and their Western counterparts. Testimony of William Browne.

**154.** Although the government's evidence with respect to certain of the procurement episodes was persuasive (see especially episodes 57, 61, 64, and 78), that introduced in connection with others, while sufficient for the purpose of sur-

viving the present motion, was not particularly convincing (see, e. g., episodes 59, 67, 75, 76, and 79). In addition, there was vigorous cross examination which tended to introduce a significant number of facts of affirmative value to defendants. See, e. g., testimony of Thomas Leming on episodes 75 and 79.

**155.** On procurement, as on interconnection of terminal equipment (see Part III–D) defendants also argue that the incidents proffered by the government are too few to sustain liability. But here, as there, the government is not required to produce evidence covering the gamut of defendants' extensive activities (although it should be noted that the government's evidence appears to cover a relatively small spectrum of Bell's total procurement, both qualitatively and quantitatively).

ment's basic procurement claim, but none of these undermines the conclusion that a case adequate to withstand the motion to dismiss has been proven.

First. Defendants argue that the government's evidence shows nothing more than that they took advantage of the efficiencies of their vertically integrated structure, as they are permitted to do under the law. Clearly, vertical integration is not prohibited *per se* (see *United States v. Columbia Steel Co.*, 334 U.S. 495, 525–26, 68 S.Ct. 1107, 1123, 92 L.Ed. 1533 (1948); *United States v. Winslow*, 227 U.S. 202, 218, 33 S.Ct. 253, 255, 57 L.Ed. 481 (1913); *United States v. Yellow Cab Co.*, 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010 (1947); Kaysen & Turner, *Antitrust Policy*, p. 123 (1959)), and even an alleged monopolist has the right to compete vigorously. See *Berkey Photo, Inc. v. Eastman Kodak Co., supra; ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423, 439 (N.D.Cal.1978), *aff'd. sub nom., Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir. 1980). But vertical integration may be unlawful under the Sherman Act if it creates monopoly power and is accompanied by an intent to exclude competition. *United States v. Paramount Pictures, Inc., supra.* Moreover, when activity among vertically-related affiliates restrains trade it violates the antitrust laws. *International Tel. & Tel. Co. v. General Tel. & Elec. Corp., supra*, 449 F.Supp. 1158, 1171–74 (D.Hawaii 1978); *United States v. Pullman Co.*, 50 F.Supp. 123 (E.D.Pa.1943), *aff'd*, 330 U.S. 806, 67 S.Ct. 1078, 91 L.Ed. 1263 (1947).

The government here did not attempt to prove that vertical integration itself amounts to anticompetitive conduct. Rather, its experts have testified that a combination of vertical integration and rate-of-return regulation has tended to generate decisions by the Operating Companies to purchase equipment produced by Western that is more expensive or of lesser quality than that manufactured by the general trade.[156] The Operating Companies have taken these actions, it is said, because the existence of rate of return regulation removed from them the burden of such additional expense, for the extra cost could simply be absorbed into the rate base or expenses, allowing extra profits from the higher prices to flow upstream to Western rather than to its non-Bell competition.[157] See *Byars v. Bluff City News Co.*, 609 F.2d 843, 861 (6th Cir. 1979); *Six Twenty-Nine Productions v. Rollins Telecasting, Inc.*, 365 F.2d 478 (5th Cir. 1966); 3 Areeda & Turner, *supra*, ¶ 726, p. 218.

Operating Company officials—as distinguished from the organizations themselves—likewise have an individual incentive to act to further this goal because, as the testimony shows, promotion decisions within the Bell System tend to create a predisposition within Operating Company managers towards deciding in favor of Western profits and against the general trade competition.[158] It seems that it is helpful to the advancement of an individual's career within an Operating Company to have had a tour of duty at AT&T headquarters in New York, and that it is common for those who occupy high-level positions in the Operating Companies to have had such a

---

**156.** The additional expense is said to exceed that for which the efficiencies of vertical integration (*e. g.*, assured sources of supply) would compensate.

**157.** See testimony of Frederick Warren-Boulton; Plaintiff's Exhibits 4916, 4917; testimony of Bruce Owen. It can be inferred from the testimony that purchasing decisions of this type have taken place. The government's evidence contained examples of independent business or engineering judgments by the Operating Companies to buy from the general trade because of lower cost, better quality, or desira-

ble features. Presumably in these cases the Operating Companies considered that the advantages of the general trade products (or the inadequacies of the Western offerings) outweighed the efficiencies to be gained from vertical integration. But they were, nonetheless, persuaded to change their minds and to purchase from Western instead—even if that meant waiting for an as yet non-existent Western product to come on the market. See episodes 55C, 64 and 78.

**158.** See testimony of William Browne; testimony of Bruce Owen.

tour at some point in their careers. Personnel rotate through Western Electric, Bell Labs, the Operating Companies, and AT&T central headquarters with some regularity, and they come to acquire a familial attitude towards the different parts of the Bell System as they rise through its ranks. Through this process, those holding management positions in the Bell Operating Companies appear to adopt the objectives, incentives, and prejudices of AT&T and Western top management as their own.

In short, the government has demonstrated that incentives other than those arising from vertical integration *per se* have underlain the procurement decisions of the Bell Operating Companies, and the *Columbia Steel* line of cases is therefore inapplicable.

Second. Defendants next assert that, to the extent that the government's procurement claims rely at all on the Bell System's integrated structure, they are barred under the doctrine of *res judicata*. See note 70, *supra*. This argument assumes that, because the government sought divestiture of Western in the 1949 suit as a remedy for alleged antitrust violations in connection with the manufacture and sale of telephone equipment, and because the government consented to entry of a judgment which did not divest Western, it is now barred from arguing as part of the procurement portion of its case that the vertical integration of the Bell System helps to foster a "buy Western bias."

■■■ This application of the *res judicata* doctrine would be tantamount to granting to the Bell System perpetual immunity from antitrust scrutiny of its procurement conduct as long as its structure remained essentially what it was in 1956. The Supreme Court has made it clear, however, that *res judicata* does not "confer ... a partial immunity from civil liability for future violations." *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955). Where a defendant has previously entered into a consent judgment with the government in a prior antitrust case, the government has a choice among three alternatives: to seek to enforce the existing decree, to attempt to have that decree modified due to changed circumstances, or to bring a new action based on new antitrust violations. See *United States v. Armour & Co.*, 402 U.S. 673, 674–75, 91 S.Ct. 1752, 1753–54, 29 L.Ed.2d 256 (1971). The government here has chosen the third alternative, and the Court will not bar it from doing so on *res judicata* grounds.

Third. Defendants argue that their alleged failure to release technical information or compatibility specifications to the general trade cannot serve as a basis for antitrust liability, relying primarily upon *Berkey Photo, Inc. v. Eastman Kodak Co.*, *supra*. Berkey competed with Kodak in processing film (photofinishing). Its claim was that Kodak's introduction, without advance notice to the industry, of a new film, requiring a new photofinishing process which could be done only with equipment purchased from Kodak, allowed Kodak to begin processing the new film several weeks before its competitors and thus gave Kodak a competitive advantage. Berkey also claimed that Kodak's failure to disclose the chemicals used in the new process caused Berkey greater expense and competitive injury. The court held that the advantages in information flow possessed by an integrated firm do not constitute antitrust violations, unless they provide a means for the firm to gain a competitive advantage in one market through monopoly power in another. 603 F.2d at 291 [159]

■■■ There are two fundamental differences between *Berkey* and the instant case. First, in *Berkey* the entity failing to disclose information to the industry was different from the buyers of the service to whom the information was useful; in the present case, it is the Bell System which both has failed to release the information and has purchased the equipment which

---

159. The court went on to state that it was unclear on the record whether or not Kodak had leveraged its monopoly power in the film market to gain an advantage in the competitive photofinishing market.

cannot be properly designed without the information. Second, Berkey was still able to process the new film despite Kodak's failure to disclose the chemicals used in the new process, albeit at greater expense; but no piece of equipment can be interconnected with the country-wide public switched network[160] unless it conforms to the compatibility standards set by Bell.[161] An inability to obtain Bell technical information/compatibility standards thus constitutes an insuperable barrier to entry to the market (and the record does not show a reasonable basis for defendants' having withheld this type of information).

## X

### Equipment Markets

In addition to proving anticompetitive conduct, the government has, of course, also the obligation to demonstrate monopoly power in the relevant markets. As indicated in Part II, *supra*, it has identified for this purpose, *inter alia*, a telecommunications equipment market with two submarkets, one for terminal equipment, the other a so-called "Bell market." Defendants' objections to the government's definition and calculation of markets in the equipment area will be considered herein under three headings: (1) that the aggregation of markets is unsound economically and legally; (2) that there has been no proof that defendants enjoy market power either in the aggregate markets or in the submarkets; and (3) that the government's contention that a Bell market exists is without legal precedent and is devoid of evidentiary support.

A. On the first issue, defendants argue that markets must be defined for antitrust purposes in the purely economic terms of substitutability in use or cross-elasticity of

demand. See the Supreme Court's holding in *United States v. duPont, supra*, 351 U.S. at 395, 76 S.Ct. at 1007, that markets must be defined to include only such goods and services as are "reasonably interchangeable by consumers." [162] Beyond that, defendants claim that the aggregation of markets prejudices their case, first, by masking an alleged downward trend in their market shares over time (see note 35, *supra* ), and second, by improperly joining two types of economic markets: those in which their market share is high but for which the government did not prove significant anticompetitive conduct, together with those for which improper conduct may have been proven but in which their market share is relatively low. This kind of joinder, it is said, leaves a misleading impression of an unlawful exercise of market power in an overall equipment market; one cannot simply add proof of the acquisition of a monopoly through legitimate competition to proof of an unsuccessful attempt at anticompetitive conduct and come up with unlawful monopolization under the Sherman Act.

■ While cross-elasticity of demand is certainly the most important determinant of market definition under the antitrust laws, it is well-established that under certain circumstances markets may be aggregated on a basis other than economic substitutability. For example, in *United States v. Grinnell, supra*, the Supreme Court aggregated central fire alarm and burglar alarm systems without suggesting that these services are economic substitutes to any extent. Rather, after finding that the systems were not interchangeable, the Court nevertheless combined them on the basis of "commercial realities" and the fact that most firms offering one of the services also offered the other.[163] Similarly, in

160. Irrespective of whether the direct interconnection is with Bell facilities or with an independent operating company which eventually connects to the Bell network.

161. Testimony of Stephen Deschaine; testimony of Elias Schnegelberger.

162. See also, *Brown Shoe Co. v. United States, supra; United States v. Grinnell Corp., supra*.

163. 384 U.S. at 572, 86 S.Ct. at 1704. From these grounds, it may be inferred that the court relied heavily upon the degree of cross-elasticity of supply in the industry. Supply cross-elasticity, no less than demand cross-elasticity, is an important factor in the definition of economic markets. If, for example, a manufacturer of women's dresses were charged with monopoli-

*United Shoe, supra,* the court expressly aggregated submarkets into an overall shoe machinery market "regardless of the relationship of a particular machine type to another type or to a particular process." 110 F.Supp. at 302–303.[164] There is, indeed, direct precedent for the combination of telecommunications equipment "as diverse in function and cost as simple telephone instruments and complex central-office switching equipment" into one aggregate market on the grounds of industry recognition, coincidence of supplying firms, and the integrated nature of the telecommunications system. See *International Tel. & Tel. Co. v. General Tel. & Elec. Corp., supra,* 518 F.2d at 934–35.

 To be sure, aggregation is not always permissible. If aggregating markets leads to the appearance of a causal link between defendants' anticompetitive conduct and their monopoly power which disappears the moment the markets are treated separately, then clearly the aggregation would be improper. See 3 Areeda & Turner, *supra,* ¶ 627b, p. 84.[165] But the evidence before the Court does not demonstrate that this is the case.[166]

 While it has been represented that defendants manufacture over 200,000 different products (many of which do not have high cross-elasticities of demand), and while it is true that the government offered proof specifically with regard to only a small fraction of that number, it is also true that much of the anticompetitive conduct described by the government's witnesses transcends individual products and broadly applies to the whole equipment spectrum. For example, in the terminal equipment interconnection area, many of the government's allegations regarding the unreasonableness of the PCA requirement and the lack of availability of the PCAs are applicable to the entire range of terminal equipment products. Similarly, in the procurement area, the government's allegations relating to the denial of technical information to the general trade suppliers, to the incentives for Operating Companies to purchase from Western Electric regardless of a product's merit, and others, pertain to the whole gamut of products procured by the Operating Companies.

In the interests of avoiding duplicative evidence and useless overburdening of the plaintiff, it is not necessary to require proof that the anticompetitive conduct resulted in the maintenance by defendants of a monopoly in each individual product market for each piece of telecommunications equipment without close substitutes.[167] Instead,

---

**164.** Among other decisions which have permitted the clustering of submarkets for analysis of market power are *United States v. Phillipsburg National Bank and Trust Co.,* 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970) (commercial banking includes the services denoted by that term); *Hartford-Empire Co. v. United States,* 323 U.S. 386, 398, 65 S.Ct. 373, 380, 89 L.Ed. 322 (1945) (automobile glass manufacturing machines); *United States v. Hughes Tool Co.,* 415 F.Supp. 637 (C.D.Cal.1976) (products used in handling of pipe and drilling and production of oil wells); *United States v. International Harvester Co.,* 214 F. 987 (D.Minn.1914), aff'd, 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302 (1927) (agricultural implements).

zation, it would not be productive to define separate markets for size six, size eight, size ten, size twelve, and size fourteen dresses. Instead, all of them could be aggregated in a single market (even though none of these is substitutable in use for another) because all are close producer substitutes, that is, they exhibit high supply cross-elasticity.

**165.** The government reads *United States v. General Electric,* 82 F.Supp. 753, 817 (D.N.J. 1949), to the contrary too broadly. If aggregation reveals "an important relationship between the defendants' course of conduct and their overall monopoly power," it is indeed a useful and, hence, appropriate methodology. If, however, aggregation obscures, rather than reveals, it cannot be justified.

**166.** Furthermore, it is not clear that aggregation would have the necessary effect of prejudicing defendants at all. When there is no substantial disparity in market shares, there is no direct effect. When such a disparity exists, aggregation results in an averaging of market share figures which, because it necessarily reduces very high shares, would normally be considered favorable to defendants. See 2 Areeda & Turner, *supra,* ¶¶ 532b, 532c, at p. 403.

**167.** As stated by one government witness, use of an aggregate equipment market is desirable where there is "a series of markets for individual pieces of equipment where the firms in-

such proof may be made in the aggregate. See *e. g., United States v. General Electric Co., supra.* Accordingly, the Court has determined that, for present purposes, the government's definition of an aggregated telecommunications equipment market and an aggregate terminal equipment submarket constitutes an acceptable approach.

Of course, if defendants are able to demonstrate that the factual predicates for aggregation are lacking—that is, if they can show that highly disparate market shares exist among the individual submarkets, and that the anti-competitive conduct alleged by the government was proved only with regard to products for which Bell's share was so low as to belie any claim of monopoly power—then disaggregation may at that time become appropriate. In the absence of such proof, however, the Court will not fault the government for not having performed the virtually impossible and redundant task of proving that each anti-competitive act of the defendants occurred in the context of, and led to the preservation of a monopoly share in, every type of

equipment manufactured by Western Electric.

■ B. Somewhat more compelling is defendants' claim that the government has failed to prove that they possess market power in the aggregate equipment market.[168] Certainly, their observation that the evidence of market share is sparse is well taken.[169] The government's witnesses in this area appear to have been sorely unprepared to support credibly the government's critical contentions. But this failure is not fatal as there was ample evidence, both testimonial and documentary, of significant barriers to entry,[170] and such barriers, as indicated *supra,* when combined with market share evidence, suffice to meet the government's burden.[171]

C. In *Brown Shoe Company v. United States, supra,* 370 U.S. at 325, 82 S.Ct. at 1523, the Court stated that the boundaries of a submarket

> may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate

volved are the same, where the behavior involved is the same, where the structural sources of that behavior and the relevant structural relief are the same across all those markets." Testimony of Bruce Owen, Tr. 10922.

**168.** Defendants have also objected that the government failed to prove market power in several subsubmarkets. However, the government has indicated, at least since its November 11, 1980 report on market contentions, that it relied upon its description of the equipment submarkets only "to establish the identity of the products included within" the aggregate equipment market. Thus, its current claim (Memorandum at p. 15 n. *) that it identified the ten subsubmarkets only "[t]o facilitate definition of the boundaries of th[e aggregate] market," has clear antecedents and renders defendants' point inapposite. This does not mean, as the Court points out *supra,* that defendants are not free to attempt to prove in their case that the individual product markets are the appropriate markets for antitrust analysis.

**169.** The evidence indicates that defendants' share in the aggregate equipment market in the years 1973–79 ranged from a low of 61.3 percent in 1975 to a high of 66.2 percent in 1973 to 65.1 percent in 1979. Defendants' market share in the terminal equipment (or customer premise systems) submarket ranged from a low of 44.0 percent in 1973 to a high of 58.2 percent

in 1977 to 54.8 percent in 1979. Ten subsubmarkets were identified, as follows: central office switching systems, large PBX equipment, key systems, single line telephone sets, terrestrial microwave systems, carrier equipment, coaxial cable, data modems, ancillary central office switching equipment, and miscellaneous terminal equipment.

**170.** The government has demonstrated the existence of barriers to entry such as control over essential facilities, entrenched brand preferences, differential risk, capital requirements, the regulatory process, and access to technical information. See p. 12, *supra.*

**171.** Defendants have pointed out a number of alleged deficiencies in the methodology used by the government's expert witness to quantify defendants' aggregate market share, and some of these criticisms appear to be well taken. However, it is easier to identify flaws in someone else's analysis of market share than it is to perform analysis that will withstand scrutiny in fact. Cf. Finkelstein, Regression Models in Administrative Proceedings, 86 Harv.L.Rev. 1442, 1446 (1973). The Court intends to avail itself also of the analysis of defendants' experts and, on that basis, assess the relative merit of the two market quantification methodologies.

economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

The government asserts that for a variety of factors—because the demands of the Operating Companies for Western Electric products are not sensitive to changes in the relationship between Western's prices and the prices of competitors, the Operating Companies are distinct customers, Western is a specialized vendor (selling only to Bell companies), and the industry recognizes the existence of a Bell market—its alleged "Bell market" squarely fits within this *Brown Shoe* definition. That, however, is too mechanical a reading of the Supreme Court's opinion. As the Court of Appeals for the Ninth Circuit stated in *International Tel. & Tel. Co. v. General Tel. & Elec. Corp.,* *supra*, 518 F.2d at 932,

> [The] indicia were listed [in *Brown Shoe*] with the intention of furnishing practical aids in identifying zones of actual or potential competition rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue. Whether or not a court is justified in carving out a submarket depends ultimately on whether the factors which one purported submarket from another are 'economically significant' in terms of the alleged anticompetitive effect.

In *ITT*, the Court was considering a claim virtually identical to that presented here. A telecommunications equipment manufacturer had argued that the relevant product market should have been defined to exclude purchases of equipment by non-operating-company customers, on the ground that they were in a different submarket from that of telephone operating companies. But the Court found the separation of the market into two submarkets by type of customer erroneous, stating (518 F.2d at pp. 932–33):

> The state of competition in the telecommunications equipment-manufacturing industry does not depend on whether the same type of equipment is purchased by a telephone operating company, a microwave common carrier, government or industry. Customer identity and industrial recognition of an independent-telephone-operating-company 'submarket' for telephone equipment are, in this instance, irrelevant because there are no corresponding factors of competitive significance in the manufacturing industry, such as differentiation of product lines, production facilities, or pricing . . . .

> Here the telephone equipment which manufacturers sell to non-operating-company customers is not only interchangeable with equipment sold to operating companies, it is identical. It makes no difference to the manufacturer whether he sells the same piece of equipment to one type of customer or the other.

The government does not allege in the instant case that there is anything inherently distinct about the Bell market relative to the overall equipment market, but only that, because of the Operating Companies' unlawful bias toward Western Electric equipment, such equipment is effectively insulated from competition with general trade equipment. But such a showing does not establish the market as a framework within which the consequences of defendants' conduct may be evaluated; rather, it demonstrates only the consequences of defendants' conduct.[172]

Under the government's theory, whenever anticompetitive conduct is alleged, that same allegation, if proved, would demonstrate ipso facto the maintenance of monopoly power over the products the monopolist sold as a result of its unlawful conduct.[173]

---

**172.** Thus, in its formulation of a separate Bell market, the government may have confused the cross-elasticity of demand criterion of market definition (which is meant to describe a "natural barrier" between two groups of products independently of action by the alleged monopolist) (see *International Tel. & Tel. Co. v. General Tel. & Elec. Corp., supra*, 518 F.2d at 931, 933)) with insulation from competition resulting from conduct by that monopolist.

**173.** If that theory were carried to it logical extreme, the government would not even have

Thus, by effectively defining a relevant market as that group of products over which defendants' anticompetitive conduct exercises control, the government's theory, as an analytic matter, reads the market definition step of the monopolization charge out of the Sherman Act. That is simply not sound economic theory or antitrust law, and, to the extent to which such a bootstrapping result may be interpreted as having been permitted in *United States v. CBS, Inc.,* 459 F.Supp. 832, 837–39 (C.D.Cal.1978), this Court disagrees with that decision.

D. That is not to say that the government will not be allowed to maintain its procurement allegations or, indeed, that it has not established a case of anticompetitive procurement conduct sufficient to survive the present motion. The government maintains two distinct contentions regarding defendants' use of market power in its procurement practices: (1) that defendants abused their monopoly power in the local exchange market by leveraging it to obtain a competitive advantage in the equipment market, and (2) that, because of the foreclosure resulting from such leveraging, entry into the equipment market is deterred, allowing defendants to preserve their monopoly position in this market.

■ With regard to the first contention, it does not need to be established that de-

fendants have, through their leveraging, acquired a monopoly in the equipment market. A Sherman Act violation is demonstrated if it can merely be shown that a firm used "its monopoly power in one market to gain a competitive advantage in another" (*Berkey Photo, Inc. v. Eastman Kodak Co., supra,* 603 F.2d at 275–76), the usual test being whether "a 'substantial' amount of competition is foreclosed." See also, *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 608–09, 73 S.Ct. 872, 880, 97 L.Ed. 1277 (1953). Relatively small market shares have been held to demonstrate such foreclosure.[174]

The government's second claim is that (Memorandum at p. 51),

'competitors do not believe they really have a fair opportunity to sell to Bell except where the product is badly needed and Western doesn't have anything to do the job.' ... *This closure has a profound impact on the overall equipment market.* Firms are reluctant to enter equipment submarkets that are otherwise attractive because a substantial 'Bell market' portions of them are closed.... Other firms, knowing that they will always remain unable to penetrate the Bell market, may refrain from adding capacity, perhaps sacrificing manufacturing economies of scale because the prospect

to allege a Bell market, but it could simply list all Western Electric products which, in its view, the Operating Companies purchased for biased reasons. If the claims of bias with regard to these products could be proved, then each of them would have to be regarded as insulated from competition from general trade products (which, by definition, are not substitutable in use).

**174.** In *International Tel. & Tel. Co. v. General Tel. & Elec. Corp., supra,* 449 F.Supp. at 1177–1183, the court exhaustively canvassed the relevant indicators of substantial market foreclosure (albeit under a charge of violation of section 1 of the Sherman Act). Based upon these criteria, and upon the market shares that other courts had held to have constituted substantial foreclosure, it concluded that a share of 7.4 percent of the market represented an unreasonable restraint of trade. See also, *United States v. Standard Oil Co.,* 253 F.Supp. 196 (D.N.J. 1966); *United States v. Brown Shoe Company,*

*supra; United States v. Kennecott Copper Corp.,* 231 F.Supp. 95 (S.D.N.Y.1964), in all of which relatively small shares were held to violate the antitrust laws. In the instant case, defendants' share of the relevant market, Bell or aggregate, far exceeds shares that have been held to violate the antitrust laws. However, the relevant measure of defendants' leveraging is its share of the aggregate equipment market, not its share of sales to its own subsidiaries. For example, one may imagine a situation in which a company such as defendants' refused to ship its manufactured products in other than internally made boxes, even though outside box manufacturers were more efficient. Such a company would have a one hundred percent share of its own market for boxes, but it would enjoy virtually a zero percent share of the overall box market. Surely, the zero percent figure is more probative of the extent to which the firm foreclosed competition than the one hundred percent statistic.

of making sales in the Bell market is too risky.... This perception has insulated important Western Electric lines from competition (emphasis added).

As the government thus appears to realize, the significant effect for this claim is that which the challenged conduct has upon the overall equipment market. In practical terms, this means that for market purposes the portion of the equipment market supplied by general trade manufacturers to the Bell Operating Companies may not be separated from those which the general trade supplies to others (the non-Bell independent operating companies, the interconnect industry, other common carriers, and end users). It follows that, if the government wishes to argue that the biased purchasing decisions of the Operating Companies have a deleterious effect upon the development of competition within the aggregate equipment market, it must compare the total demand for telecommunications equipment in the nation with the fraction thereof supplied by the general trade (as distinguished from comparing merely Bell's demand for equipment (*i. e.*, the Bell Market) with the fraction thereof supplied by the general trade). See 2 Areeda & Turner, *supra*, ¶ 527a, at pp. 376–78.

For these reasons, the portions of the government's contentions alleging the existence of, or acquisition by defendants of monopoly power within, a Bell market will be stricken, and defendants need not offer evidence to rebut the existence of such a market. In all other respects, however, the government's equipment market contentions are sustained.

## XI

### Equipment Pricing

The government's contentions relating to the pricing of equipment sold by Western Electric to the Operating Companies do not, theoretically, differ from its overall pricing theory: here, too, it is claimed that Bell priced "without regard to cost," and for the reasons discussed in Part VIII *supra*, the Court is not prepared, at this time, to accept defendants' contention that the government is precluded from establishing anticompetitive pricing without demonstrating that prices of Western Electric products were below marginal costs. However, the evidence that the government has adduced in the equipment pricing context in support of its claims is grossly weaker than the evidence introduced in the context of intercity services.

The evidence on equipment pricing is in three parts. First, there was proof that the Bell System license contract procedure allowed defendants improperly to shift costs of Bell Labs and AT&T's General Department to the Operating Companies by means of an aggregation of costs (as distinguished from charging costs to individual products). Second, it appeared that Bell improperly shared costs appropriately allocated to individual products with other products in the same product line in order to understate the cost of products facing competition. Third, evidence was adduced indicating that the Bell System selectively abandoned its own costing procedures by intentionally setting prices on the basis of understated cost estimates (rather than by using standard costs), by deviating from standard product line mark-up figures when necessary to decrease prices, and by improperly configuring product lines to group products with dissimilar cost characteristics in order to understate particular product costs.

Although theoretically such practices might prove anticompetitive intent, the evidence actually presented in all of these categories was so sparse, and the testimony of the government's principal witness in this area, Dr. Marvin H. Kahn, was so weak and was rendered so incredible by his evident lack of preparation and lack of cursory knowledge of telecommunications equipment pricing practices, that the Court concludes that the government has failed to prove any of its contentions regarding anticompetitive pricing in the equipment field.

Dr. Kahn conceded that he examined a total of only "three or four" products in detail. In developing his claims of pricing abuses, he associated each claim with the

products to which he believed it applied.[175] Even if each of these objections were telling and were deemed to lead inexorably to an inference of anticompetitive intent in each instance in which the alleged objectionable practice occurred—neither conclusion being warranted by the testimony—the paucity of the products examined by the witness critically undermines the probative value of his testimony.

On the basis of the record established by the government, the Court would not be justified in imposing upon defendants the burden of going forward with refuting a case that essentially has never been made. The government's proof of anticompetitive intent through equipment pricing practices is "utterly lacking" (*Northeastern Tel. Co. v. Am. Tel. & Tel. Co.*, supra, 651 F.2d at 95 n.28 1981–1 Trade Cas. at 76,322 n. 28), and its contentions relating to the pricing of Western Electric equipment for sale to the Operating Companies will accordingly be stricken.

## XII

### Conclusion

The motion to dismiss is denied. The testimony and the documentary evidence adduced by the government demonstrate that the Bell System has violated the antitrust laws in a number of ways over a lengthy period of time. On the three principal factual issues—whether there has been proof of anticompetitive conduct with respect to the interconnection of customer-owned terminal equipment (Part III), the Bell System's treatment of competitors in the intercity services area (Part IV), and its procurement of equipment (Part IX)—the evidence sustains the government's basic contentions, and the burden is on defendants to refute the factual showings made in the government's case-in-chief.

The Court holds in favor of the position espoused by the government on the legal issues relating to course-of-conduct (Part I–B), the jurisdiction of the Federal Communications Commission (Part I–C), the existence of monopoly power notwithstanding regulation (Part II), and the bulk of the equipment market questions (Part X–A, X–B), but it decides, in line with defendants' position, that any obligation to provide equality of access in interconnection is subject to a reasonableness test. Judgment is reserved until the conclusion of the entire case on the relationship between the communications laws and the antitrust laws (Part V) and on the intercity pricing claim (Part VIII). Contentions of the government relating to the Bell System's representations to the FCC (Part VII), those alleging the existence of a Bell market (Part X–C), and those which concern equipment pricing (Part XI) will be stricken on the basis of the findings stated herein.

175. For the spreading of expenses over products arbitrarily, the witness identified the treatment of warranty and merchandising expenses for the 400D line card. For the composition of product lines, he offered the Dimension PBX in relation to the entire customer premises product line. On the issue of pricing from cost estimates, instead of waiting for standard costs, the witness suggested the 5A community dialing office. In the category of abandonment of conventional mark-up factors, he mentioned both the 770A PBX and the 5A community dialing office. Finally, as affected by the license contract arrangement, Dr. Kahn identified PBX's, although virtually no evidence was presented supporting the government's claim that the license contract improperly allocated costs for any products.